Argued and submitted January 11, 2011, resubmitted January 7, decision of
Court of Appeals reversed, judgment of circuit court affirmed May 31, 2013

STATE OF OREGON,
*Petitioner on Review,*

*v.*

NATASHA LARAE FAIR,
nka Natasha Larae Ortega,
*Respondent on Review.*

(CC 06FE1759AB; CA A136985; SC S058458)

302 P3d 417

Susan G. Howe, Senior Assistant Attorney General,
Salem, argued the cause for petitioner on review. With her
on the brief were John R. Kroger, Attorney General, and
Mary H. Williams, Solicitor General.

Joshua B. Crowther, Chief Deputy Defender, Office of
Public Defense Services, Salem, argued the cause for respondent on review. With him on the brief was Peter Gartlan,
Chief Defender.

Before Balmer, Chief Justice, and Kistler, Walters,
Linder, Landau, and Baldwin, Justices.**

_____

** Brewer, J., did not participate in the consideration or decision of this case.

LINDER, J.

**LINDER, J.**

Two law enforcement officers, believing that defendant was being assaulted, responded to an incomplete 9-1-1 call that had been traced to defendant's home. One officer took defendant's husband into custody, while the other officer proceeded to interview defendant on the porch of her home. While interviewing defendant, the officer made an observation that caused him to reasonably believe defendant might be in possession of drugs. The officer asked defendant if he could search her, and she agreed. During the search, the officer discovered a glass pipe with drug residue on it. Defendant was subsequently charged with possession of a controlled substance.

The issue that this case presents is whether the officers' actions, commands, and inquiries in investigating the possible domestic assault resulted in a seizure of defendant within the meaning of Article I, section 9, of the Oregon Constitution and, if so, whether that seizure was constitutionally permissible. As we will explain, we conclude that defendant was seized for constitutional purposes, but we further conclude that the seizure was lawful. We accordingly reverse the decision of the Court of Appeals and affirm the trial court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

Lieutenant Utter and Deputy Mendoza were dispatched to defendant's house to investigate an incomplete 9-1-1 call traced to that address. The dispatch operator had reported that, during the call, a woman was overheard saying "stop it" and "get off me," a man was heard yelling in the background, and then the call was disconnected. While the officers were en route to the house, dispatch made several attempts to call the number from which the 9-1-1 call had been initiated, but no one answered.

After arriving at the house, Utter and Mendoza circled it on foot. Through a sliding glass door at the back of the house, Mendoza observed an angry-looking man. Mendoza "command[ed]" the man to come to the door and to keep his hands where Mendoza could see them, but the man moved farther into the house, out of Mendoza's sight. Utter and Mendoza

went to the front of the house and knocked on the door. Within a few moments, defendant and the man, later identified as defendant's husband, answered the door together. Utter observed a large swollen area over defendant's right eye, but no signs of injury to her husband. Mendoza ordered both defendant and her husband to come out of the house and onto the porch. As they did so, Mendoza handcuffed the husband and moved him to the far side of the porch, approximately 20 feet away from defendant. The husband called out to defendant as he was moved, telling her not to say anything. Utter "instructed" defendant to stay where she was on the porch, and the officers positioned themselves between defendant and her husband. Defendant's husband continued to call out to defendant intermittently during the ensuing interview, telling her not to talk to Utter.

After Mendoza took defendant's husband into custody, Utter conversed with defendant. Utter explained that he and Mendoza were there because of the incomplete 9-1-1 call received by dispatch that was traced to the address. Defendant initially denied making the call, but then said that she had done so accidentally. When Utter continued to ask defendant about the call, defendant admitted that she had been arguing with her husband and had called 9-1-1 when the argument escalated. Utter asked defendant for identification. She said she did not have any. Defendant told Utter her name and birth date and said that she and her husband were recently married. When asked, defendant also provided her maiden name. When Utter ran defendant's married and maiden names through dispatch, the dispatch operator told him that there were no "wants" for defendant and no driving record for her. Because there was no driving record for her, Utter asked defendant if she had ever had a driver's license, and she said she had not. Utter was able to determine from dispatch that someone with defendant's maiden name had had "some form of contact" with law enforcement previously. Utter asked if defendant had ever been arrested. When she replied that she had been, he asked for what crime, and she said that the arrest had been for drug possession.

Utter then turned his questioning to the argument leading up to the 9-1-1 call and asked defendant in particular

about the evident injury above her eye. Defendant told him that it was accidentally inflicted when items she was loading on top of a vehicle slipped. As Utter began asking whether defendant felt threatened by her husband during the argument, Utter observed an orange plastic syringe cap fall out of defendant's pant leg. That observation prompted Utter to question defendant about her drug use. Defendant admitted to using intravenous drugs and ultimately consented to Utter's search of her person. In the back pocket of defendant's pants, Utter discovered a wadded-up napkin containing a broken glass pipe with drug residue on it. Utter alerted Mendoza to his discovery, and Mendoza placed defendant under arrest for possession of a controlled substance.

Before her trial on that charge, defendant moved to suppress the pipe, arguing that, under Article I, section 9, of the Oregon Constitution, the officers' conduct and commands before Utter observed the syringe cap fall from defendant's pant leg, had resulted in the officers unlawfully "seizing" defendant. Defendant urged that her consent to search was a product of that illegality, with the result that the pipe discovered during the search should be suppressed. The state countered that "[t]here was no unlawful stop" because none of the officers' actions or commands amounted to a seizure for constitutional purposes. According to the state, defendant was lawfully searched based on Utter's observation of the syringe cap, which gave him a reasonable basis to believe defendant was in possession of drugs at that time, at which point Utter requested, and defendant voluntarily gave, consent to the search.

The trial court denied defendant's motion to suppress, agreeing with the state that defendant had not been seized. Defendant entered a conditional plea of guilty, reserving her right to challenge the trial court's denial of her suppression motion. She later appealed, and the Court of Appeals reversed. On appeal, the court observed that defendant was "ordered—not requested—to come out of her house and was told to remain outside with the officer while an investigation occurred." *State v. Fair*, 233 Or App 298, 309, 225 P3d 848 (2010). The court concluded that, "because defendant had been unlawfully seized before Utter observed

the syringe cap and the additional evidence that followed that observation, the trial court erred in denying defendant's motion to suppress evidence." *Id*. We allowed the state's petition for review.

## II. ANALYSIS

A. *Was Defendant Seized Under Article I, Section 9?*

The threshold question is whether the officer, in the course of investigating the possible domestic assault, seized defendant within the meaning of Article I, section 9.[1] If, as the trial court concluded, defendant was not seized, that ends the inquiry in this case. On the other hand, if, as the Court of Appeals concluded, defendant was seized, we must also determine whether the seizure was lawful and, if it was not, whether defendant's consent was a product of the unlawful seizure.

As this court has observed, "[t]here potentially is an infinite variety of encounters between law enforcement officers and citizens[,]" and "[n]ot every such encounter constitutes a 'seizure' of the citizen" for constitutional purposes. *State v. Holmes*, 311 Or 400, 406-07, 813 P2d 28 (1991). Analytically, police-citizen encounters typically fall into one of three categories that correlate the degree of intrusiveness on a citizen's liberty with the degree of justification required for the intrusion. *Id*. at 407.[2] At one end of the continuum are mere encounters for which no justification is required. *Id*. At the other end are arrests, which involve protracted custodial restraint and require probable cause. *See id*. (noting arrests are third category of police-citizen encounter and also entail a "seizure" of a person). In between are temporary detentions for investigatory purposes, often termed "stops," which generally require reasonable suspicion. *Id*. Both stops and

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[2] As this court explained in *Holmes*, "[t]he three categories are guidelines only. They are neither exhaustive nor conclusive as to what police action is a 'seizure' of a person." 311 Or at 407-08.

arrests are seizures for constitutional purposes, while less restrictive encounters are not.

This court recently clarified the standard for determining when a police-citizen encounter rises to the level of a constitutional seizure. Specifically, we held that a seizure occurs

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred."

*State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) (emphasis omitted).[3] In applying that standard, we look to whether the encounter entailed a significant "restraint on [defendant's] liberty" imposed "either by physical force or through some show of authority." *Id.* at 309 (internal quotation marks omitted). The inquiry is necessarily fact-intensive and circumstance-specific. *See Holmes*, 311 Or at 408 (application of standard for seizure "require[s] a fact-specific inquiry into the totality of the circumstances of the particular case"). As this court has emphasized, not every action by an officer to stop and engage a citizen is constitutionally cognizable as a seizure:

"Under these 'seizure' standards, law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful. A street or public place encounter does not amount to an Article I, section 9[,] 'seizure' merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer. Even physical contact does not transform the encounter into a 'seizure' if it is a normal means of attracting

---

[3] The constitutional standard for a seizure was originally announced in *Holmes* and included consideration of the citizen's subjective belief that police were depriving the citizen of her or his freedom or liberty of movement. 311 Or at 409-10. *Ashbaugh* modified the standard by abandoning the subjective component and retaining an objective test that focuses on whether a reasonable person *would* believe (as opposed to *could* believe) that a significant restriction had occurred. 349 Or at 316.

a person's attention (*e.g.,* policeman tapping citizen on the shoulder at the outset to get a citizen's attention). *See* LaFave, 3 *Search and Seizure, A Treatise on the Fourth Amendment* 413, § 9.2(h) (2d ed 1987). Rather, the encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens. *See id.*"

*Id.* at 410. Although the standard to be applied can be readily articulated, in practice, the line between a "mere encounter" and something that rises to the level of a "seizure" does not lend itself to easy demarcation. Depending on the circumstances involved, "[i]n many cases it is clear that a person has been 'seized.' But there are many instances in which it is less obvious whether a police-citizen encounter is a 'seizure.'" *Id.* at 407.

In this case, in arguing that she was seized, defendant focuses on what she characterizes as an "escalating show of authority" by the law enforcement officers that began with them entering the backyard without permission and commanding defendant's husband to come to the sliding glass door, keeping his hands visible. When defendant's husband retreated farther into the house and out of view, the officers went to the front door and knocked. After a few moments, defendant and her husband opened the door, at which point Mendoza ordered them to step out onto the porch. Mendoza handcuffed defendant's husband and moved him to the far end of the porch, while Utter told defendant to stay where she was, and began to question her. Relying on the totality of those facts, defendant argues that when Mendoza ordered her out of her home and Utter ordered her to stay where she was on the porch while he questioned her, those actions amounted to a clear show of authority that restrained defendant's liberty and freedom of movement. Citing *State v. Dahl*, 323 Or 199, 206-07, 915 P2d 979 (1996), defendant urges that a law enforcement command to exit and remain outside one's own home under circumstances such as these constitutes a seizure for constitutional

purposes, and is not analogous to the far less intrusive public place encounters with motorists, such as that involved in *Holmes*.

The state responds by agreeing that, if the officers had detained defendant and investigated her as someone who had possibly committed a crime, their conduct would have amounted to a seizure. The state argues, however, that the intrusiveness of the officers' conduct was significantly lessened because they detained defendant as a potential victim who might need emergency assistance and who could provide information about the possible assault on her by her husband. The state relies on *State v. Gerrish*, 311 Or 506, 815 P2d 1244 (1991), to urge that, when officers detain and question a citizen as a potential witness to or victim of a crime, rather than as the suspect who may have committed the crime, the encounter takes on a different character, one that is significantly less intimidating and intrusive to the citizen being detained. As the state understands *Gerrish*, this court "explicitly held that a police officer could temporarily detain a potential witness to a crime, for purposes of making a limited inquiry, with*out* implicating Article I, section 9." (Emphasis in original.)

The state, however, reads *Gerrish* too broadly. To better explain the limits of our holding in *Gerrish*, we begin with a more detailed description of our holding in *Holmes*, on which *Gerrish* relied.

*Holmes* involved a detour set up by a deputy sheriff at one side of a bridge to reroute traffic around the scene of a motor vehicle accident. The deputy had placed flares on the highway and had activated the overhead lights on his patrol car. He was in uniform, holding a flashlight, and directing traffic. The defendant drove a few feet beyond where the deputy had directed the defendant to stop, then spoke to the deputy though the rolled-down window of the defendant's car. While the deputy was explaining to the defendant the need to take the detour, the deputy made observations that gave him probable cause to believe that the defendant was intoxicated. The defendant was ultimately arrested and charged with driving under the influence of intoxicants. Before trial, he sought to suppress evidence of his intoxication

on the ground that he had been unlawfully seized when the deputy ordered him to stop. *Holmes*, 311 Or at 402-03. This court concluded that the defendant had not been seized for purposes of Article I, section 9, when the deputy stopped the defendant's vehicle "to advise him that, because of an accident, the highway ahead was closed and that an alternate route was necessary." *Id*. at 411. The court reasoned that seeing a deputy directing or stopping traffic because of a motor vehicle accident is a common experience; that "[n]o psychologically intimidating environment had been created"; and that the deputy "did not question defendant, request any identification, make any threats or draw any weapons." *Id*. Rather, "[t]he intrusion was tailored in direction and manner to be insignificantly intrusive," with the result that it "did not *significantly* restrict, interfere with, or otherwise deprive [the] defendant of his liberty or freedom of movement." *Id*. (emphasis in original).

*Gerrish*, which was decided only two months after *Holmes*, involved similar facts, and led to a similar holding. There, a state police officer was stopping all vehicles on the only road exiting a coastal resort where a robbery and shooting had recently occurred. The purpose of the stops was "to determine whether any of these persons witnessed the shooting/robbery, or to possibly find the perpetrator." *Gerrish*, 311 Or at 508 (quoting from trial court's findings of fact). The officer had turned on his patrol car's flashing overhead lights and was stopping each car on the road. When the defendant drove by without stopping, the officer ordered the defendant to stop, which he did. The officer approached the defendant and asked him if he knew anything about the robbery. In the course of that questioning, the officer made observations that gave him reason to believe that the defendant was driving while intoxicated, and the defendant was subsequently arrested. As in *Holmes*, the defendant was arrested for driving under the influence of intoxicants and, at trial, the defendant challenged the stop as an unlawful seizure under Article I, section 9. *Id*. at 509. This court concluded, as it had in *Holmes*, that the defendant was not seized until after the officer had developed reasonable suspicion that the defendant was driving while intoxicated. *Id*. at 513. In explaining that conclusion, the court's description of the

officer's actions echoed the description in *Holmes*, quoted above, of "public place encounters" between officers and citizens:

> "[T]he officer's initial actions of flagging defendant down and directing him to stop were the only means available to get [the] defendant's attention long enough to request information. These actions are analogous to 'tapping [a] citizen on the shoulder at the outset to get a citizen's attention.' This is not a significant restriction upon or interference with an individual's liberty or freedom of movement; nor would a reasonable individual believe that it was."

*Id.* (quoting *Holmes*, 311 Or at 410). Thus, according to the court, because the defendant's vehicle was stopped in an ordinary manner so that the officer could request information, no seizure occurred for purposes of Article I, section 9.

Together, *Holmes* and *Gerrish* stand for the limited proposition that a law enforcement officer constitutionally may halt and briefly detain a person passing through a public area as a means to engage the citizen long enough to impart information or seek the citizen's cooperation or assistance. As *Holmes* emphasized, police are free to "approach persons on the street or in public places, question them, and even accompany them to another location without the encounter necessarily constituting a 'seizure' of a person[.]" 311 Or at 409. As *Gerrish* emphasized, especially in the case of a motorist, halting and briefly detaining a citizen, even when done pursuant to an officer's show of authority, is often a nonintrusive and socially inoffensive way to seek a citizen's cooperation or impart information. 311 Or at 513. The important distinction in both cases was the public nature of the encounter and the practical reality that authoritatively halting the passing motorists is often the only practical means for police to have an exchange with them.[4] No seizure occurs because the police conduct is not a socially intrusive exercise of police authority in those particular settings and circumstances. Neither case stands for the broad proposition

---

[4] The court in *Holmes* also remarked that "[i]t would be anomalous to guarantee a motorist greater freedom of movement than is afforded a pedestrian." 311 Or at 411.

that the protections of Article I, section 9, do not extend to persons that police stop and detain as potential witnesses.[5]

The remaining question in this case is whether the officers, in responding as they did to the emergency 9-1-1 call and in ordering defendant to exit her home and remain on the porch, seized defendant for purposes of Article I, section 9. As both parties emphasize, that determination "require[s] a fact-specific inquiry into the totality of the circumstances of the particular case." *Holmes*, 311 Or at 408. Here, the state points out that defendant initiated the contact by calling 9-1-1 and then aborted the call. In responding to that tacit invitation by defendant to come to her aid, law enforcement officers did what was minimally necessary to be able to engage defendant to determine if she had been assaulted by her husband and whether she needed emergency aid. The state urges that the officers' conduct in ordering defendant and her husband out of the house and onto

---

[5] As the state points out, the court in *Gerrish* acknowledged in a footnote that the officer, in stopping all cars leaving the resort, had the dual purpose of questioning witnesses *and* possibly apprehending a suspect. The court declined to analyze whether the defendant was lawfully stopped as a criminal suspect because "the officer was justified in stopping [the] defendant as a potential witness[.]" *Gerrish*, 311 Or at 512 n 2. The point of the footnote was simply that, when officers have a lawful basis for stopping a citizen (*viz.*, to briefly halt passing motorists long enough to impart information, give aid, or seek cooperation) it does not matter whether they would have been able to stop and detain any particular driver as a criminal suspect. *See State v. Tucker*, 286 Or 485, 492-93, 595 P2d 1364 (1979) (if police officer has objective basis for stop, stop is not rendered invalid by fact that officer subjectively suspects person of criminal conduct for which officer lacks sufficient justification to stop). Said another way, an otherwise authorized stop is not "rendered invalid by the arresting officer's hope or belief, even if that hope or belief is one of the reasons for his action, that evidence of some other offense may come to light during the course of the encounter." *Id.* at 495.

A later footnote in *Gerrish* underscored the limits of its rationale. In rejecting the defendant's argument that he was seized for purposes of the Fourth Amendment of the United States Constitution, this court observed that the American Law Institute's *Model Code of Pre-Arraignment Procedure* (1975) would authorize officers to detain a potential witness for questioning under specified circumstances. *Gerrish*, 311 Or at 515 n 4. The commentary to the *Model Code* referred in particular to the need for "coercive stop[s]" of motorists given the lack of any other means to secure their voluntary cooperation. *Id.* The court in *Gerrish* noted that, despite the commentary's "coercive stop" characterization, the court did not consider such an action necessarily to be a seizure for constitutional purposes for the reasons that the court had discussed in the text of the opinion. *Id.* That footnote reinforced the court's essential holding—*viz.*, that some actions that officers take in halting and engaging citizens in public settings and in common with other passing citizens are not, in a constitutional sense, "coercive" and are not sufficiently intrusive to constitute seizures for constitutional purposes.

the porch, thus separating the two so that police could talk to defendant free of her husband's interference, was not a significant intrusion on defendant's liberty or freedom of movement, nor would a reasonable person in defendant's situation perceive it to be.

In our view, this is one of those instances, referred to in *Holmes*, that presents a close question as to whether the police-citizen encounter is a "seizure" for constitutional purposes. 311 Or at 410. But we conclude that the officers' conduct *vis-à-vis* defendant was a seizure. The principal deciding factor is the setting involved—the privacy of defendant's home and her interest in her personal autonomy within that place.[6] An ultimate objective of the constitutional protections, both state and federal, against unreasonable searches and seizures is "to protect the individual in the sanctity of his [or her] home[.]" *State v. Duffy et al.*, 135 Or 290, 297, 295 P 953 (1931); *see generally State v. McDaniel*, 115 Or 187, 204-05, 231 P 965 (1925) (discussing constitutional protections against unreasonable searches and seizures as rooted in common law protection for sanctity of home). The degree to which law enforcement conduct intrudes on a citizen's protected interest in privacy and liberty is significantly affected by where the conduct occurs, such as in the home, in an automobile, or on a public street. *See State v. Tourtillott*, 289 Or 845, 865, 618 P2d 423 (1980) (so observing under Fourth Amendment to United States Constitution). A government intrusion into the home is at the extreme end of the spectrum: "Nothing is as personal or private. Nothing is more inviolate." *Id.* Thus, while an officer ordinarily may make an arrest on probable cause alone, without seeking a warrant, when the arrest requires forcible entry into a private residence, an arrest warrant is required, unless exigent circumstances excuse obtaining one. *See generally*

---

[6] Our focus on the significance of the setting in this case should not be understood to mean that police conduct in halting, detaining, and directing the actions of citizens in public settings, as opposed to private homes, cannot constitute a seizure when done to engage those citizens as potential witnesses or victims, either to impart information, seek cooperation, or to offer emergency aid. We have no occasion in this case to explore those different factual scenarios, other than that to point out that, consistently with the holdings in *Holmes* and *Gerrish*, there at least are circumstances in which law enforcement efforts to engage citizens are not sufficiently intrusive on an objective basis as to rise to the level of a seizure. Beyond that, other cases will have to be resolved on their individual facts.

*State v. Olson*, 287 Or 157, 165, 598 P2d 670 (1979) (declaring rule). That distinction animated our holding in *Dahl*, where we concluded that the police order to the defendant to come out of his house "with his hands up" ran headlong into the added limits on police authority to invade the liberty of a citizen in the privacy of his own home. 323 Or at 207, 209 (to seize a person inside his home by commanding his exit would be inconsistent with well-established limits on police authority to enter home without warrant). Here, too, the officers' orders to defendant to come out of her home and then remain where she was on the porch likewise ran headlong into the added limits on police authority that apply to a citizen in the privacy of her home.

We therefore agree with the Court of Appeals, which concluded that the officers' conduct here went beyond that in *Holmes* and *Gerrish* and amounted to a significant restraint on defendant's liberty within her own home sufficient to constitute a seizure:

> "The 'mere encounters' in *Holmes* and the cases underlying it occurred in streets or other public places. There is a significant difference between the typical circumstances of a police officer approaching a person on a public street—for example, by flagging down a motorist in order to conduct a brief exchange of information, as was the case in *Holmes*[ and] *Gerrish* \* \* \*—and a police officer going to the door of a person's home, ordering the person out of the home, and instructing the person to remain with the police officer, which is what occurred in this case."

*Fair*, 233 Or App at 308. The officers' conduct in ordering defendant to step out of her home was a show of authority that significantly intruded on her liberty and amounted to a seizure under *Dahl*. The subsequent order to remain on the porch while one officer questioned her immediately followed the order to step out of the house. That second order continued the initial intrusion by restraining defendant from being free to reenter her home or otherwise enjoy the liberty she would ordinarily enjoy in the environment of her own home and property. Under the circumstances, that show of authority, too, was a sufficient intrusion on defendant's liberty to constitute a seizure for purposes of Article I, section 9.

## B. *Was the Seizure Lawful?*

With that conclusion in place, the next question is whether defendant's seizure was lawful under Article I, section 9. By its terms, Article I, section 9, does not prohibit all searches and seizures. Rather, it guarantees citizens the right to be "secure in their persons * * * against unreasonable search, or seizure." Or Const, Art I, § 9. Although the syntax differs, the guarantee of the Fourth Amendment to the United States Constitution is substantively the same: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, * * *." Both provisions impose limitations on searches and seizures "in order to prevent arbitrary and oppressive interference by [law] enforcement officials with the privacy and personal security of individuals." *Tourtillott*, 289 Or at 853 (discussing state and federal law principles). And for both provisions, the touchstone is reasonableness. *State v. Guggenmos*, 350 Or 243, 257 n 6, 253 P3d 1042 (2011) (Article I, section 9); *Terry v. Ohio*, 392 US 1, 19, 88 S Ct 1868, 20 L Ed 2d 889 (1968) (Fourth Amendment).

Consequently, for purposes of Article I, section 9, this court has embraced the analysis that originated under the Fourth Amendment, which distinguishes between temporarily detaining for investigation and arresting on probable cause. In particular, this court has recognized that "there is nothing ipso facto unconstitutional in the brief detention of citizens under circumstances not justifying an arrest, for purposes of limited inquiry in the course of routine police investigations." *State v. Cloman*, 254 Or 1, 7, 456 P2d 67 (1969) (quoting with approval *Wilson v. Porter*, 361 F2d 412, 415 (9th Cir 1966).[7] To be constitutional, such a detention does not require probable cause. Rather, "due regard for the

---

[7] *Cloman* was not explicitly based on Article I, section 9, but the length to which it went to explain its "approval" of the federal analysis, rather than merely follow it, suggested implicitly that the court was deciding the case as a state law matter. Both this court and the legislature so understood *Cloman*. After *Cloman*, the legislature enacted the Oregon stop statutes (ORS 131.605 to 131.625) and, in doing so, sought to codify both this court's decision in *Cloman* and the United States Supreme Court's decision in *Terry*. *See State v. Valdez*, 277 Or 621, 624-26, 561 P2d 1006 (1977) (describing origins of stop statutes). Since that codification, this court has viewed the statute as protecting the interests secured by both Article I, section 9, and the Fourth Amendment. *Id.* at 629; *see also State v. Kennedy*, 290 Or 493, 497, 624 P2d 99 (1981) (Oregon stop statutes were intended to codify

practical necessities of effective law enforcement requires that the validity of brief, informal detention be recognized whenever it appears from the totality of the circumstances that the detaining officers could have had reasonable grounds for their action." *Id.* at 8 (quoting with approval *Porter*, 361 F2d at 415). Thus, as already described, Article I, section 9, typically requires a degree of justification for a seizure of a person that correlates with the extent to which police conduct intrudes on that citizen's liberty. *See Holmes*, 311 Or at 407 (describing three general categories of police-citizen encounters). To arrest a citizen, an officer must have probable cause. *Id.* But when the intrusion is less—such as a temporary detention and questioning of a person—so, too, may the justification be less. Temporary detention for investigation requires only reasonable suspicion. *Id.*

Relying on those precepts, the state urges that the same "due regard for the practical necessities" of law enforcement and the same lesser intrusion on liberty entailed by a temporary detention that justify detaining a potential suspect equally justify the temporary detention of a potential witness who can provide information about a crime. The state proposes a rule that would recognize temporary investigatory detentions of witnesses to be lawful if (1) the officer reasonably believes that an offense involving danger of forcible injury to a person has recently been committed nearby; (2) the officer reasonably believes that the person has knowledge that may aid the investigation of the suspected crime; and (3) the detention is reasonably necessary to obtain or verify the identity of the person, or to obtain an account of the crime.

Defendant's argument, in response, proceeds from a different premise. Defendant asserts that, under Article I, section 9, all searches and seizures must be authorized by a constitutionally sufficient warrant or fall within an exception to the warrant requirement. In defendant's view, therefore, law enforcement officials who seek to question a potential witness to or victim of a crime have only two choices. One is to engage a citizen in a noncoercive (*e.g.*, nonseizure)

decisions by this court interpreting Article I, section 9, and the United States Supreme Court interpreting the Fourth Amendment).

fashion, as occurred in *Holmes*, which is conduct that falls outside of Article I, section 9, altogether. Alternatively, officers may use the procedures established by statute to subpoena a witness or hold a material witness pursuant to judicial order,[8] unless confronted by an exigency of the kind that would excuse seeking a search warrant. Defendant's position is that, in the absence of (1) a subpoena, (2) a material witness order, or (3) an exigency, any detention and questioning of a witness is *per se* unreasonable and violates Article I, section 9.

Contrary to the premise of defendant's position, however, the warrant requirement traditionally has not extended to the same extent and in the same way to seizures of persons, as it has to searches and seizures of premises and property. At common law, a police officer could arrest a citizen if that citizen committed a crime in the officer's presence; the officer was not required to first obtain a warrant. *See Duffy*, 135 Or at 301-02 (discussing common law); *see generally Atwater v. Lago Vista*, 532 US 318, 328-36, 354, 131 S Ct 1536, 149 L Ed 2d 549 (2001) (extensive discussion of common-law arrest authority). Such an arrest has long been recognized as a reasonable seizure for purposes of both the state and federal constitutions, regardless of whether the officer could have obtained an arrest warrant. *See Duffy*, 135 Or at 301-02 (so holding under Article I, section 9); *Atwater*, 532 US at 328-36, 354 (holding that arrest of citizen who commits offense, whether misdemeanor or felony, in officer's presence is lawful under Fourth Amendment). The exception to that rule has been when the arrest requires an entry into private premises. In that circumstance, officers must obtain an arrest warrant unless an exigency excuses first doing so. *Olson*, 287 Or at 165 (declaring rule). But the requirement of a warrant arises because the warrantless seizure of the person who is in his or her private premises, and not in public, would run counter to "the considerable body of law that has developed to protect an individual's belongings

---

[8] *See, e.g.*, ORS 136.557 to 136.570 (providing for subpoenas to compel attendance of witnesses at preliminary hearings, grand jury proceedings, and trial); ORS 136.608 (providing for district attorney or defendant to apply to court for a material witness order; requiring sworn application establishing, *inter alia*, that person subject to order possesses information material to pending charge or grand jury proceeding and will not appear when attendance is required).

from unreasonable search and seizure in his home," which is a protection that "safeguard[s] the individual himself in the same setting." *Id.* at 164 (quoting with approval *People v. Ramey*, 16 Cal 3d 263, 275, 545 P2d 1333, 1340, *cert den*, 429 US 929 (1976)); *see also Payton v. New York*, 445 US 573, 586-90, 100 S Ct 1371, 63 L Ed 2d 639 (1980) (without a warrant, searches and seizures inside a house are presumptively unreasonable; without exigent circumstances and probable cause to arrest, officers may not enter home to arrest without warrant). If the person to be arrested is not in a home or similar premises protected from entry under the constitution, no warrant to make the arrest is required.

Indeed, were a warrant, or an exception to a warrant, required for a seizure of a person outside the home, no *Cloman-* or *Terry*-like stop of a criminal suspect based on reasonable suspicion would be constitutionally permissible. The only warrant known to the law for a seizure of a criminal suspect is an arrest warrant. There is not, nor could there be, a warrant to detain on reasonable suspicion; a constitutionally sufficient warrant must be supported by probable cause. *See* Or Const, Art I, § 9 ("no warrant shall issue but upon probable cause"); US Const, Am IV (same). Exceptions to the warrant requirement excuse the necessity of obtaining a warrant from a neutral magistrate in advance of a search or seizure; they do not change the requirement that police have probable cause to support their action. In other words, the very premise of defendant's position runs counter to the developed law regarding temporary detentions of citizens for investigatory purposes.

The question here accordingly narrows to whether it is reasonable for a law enforcement officer to take an intermediate step that is short of arrest, but that still entails significantly restricting the citizen's freedom to leave, in order to question the citizen as a potential witness to or victim of a crime. With apparent unanimity, other courts and authorities examining that question under the Fourth Amendment and parallel state constitutional provisions have concluded that the answer is yes, although the circumstances in which such stops have been found reasonable are sometimes more limited than those that justify stops of criminal suspects. *See generally* Wayne R. LaFave, 4 *Search and Seizure* § 9.2(b),

377-81 (5th ed 2012) (discussing principles and citing representative cases).

In reaching that conclusion, many have followed, to one extent or another, the lead of the *Model Code of Pre-Arraignment Procedure*, which identifies various circumstances in which a law enforcement officer may "order a person to remain in the officer's presence near such place for such period as is reasonably necessary" to accomplish certain authorized purposes in the investigation of crimes. American Law Institute, *A Model Code of Pre-Arraignment Procedure* § 110.2(1), 5 (1975) (*Model Code*). Although much of that section of the *Model Code* addresses stops of persons suspected of involvement in criminal activity, subsection (1)(b) is addressed to witnesses as well. *Model Code* § 110.2(1)(b) at 6. In particular, under the *Model Code*, it is lawful for officers to stop and temporarily detain a potential witness for questioning if the officer has (1) reasonable cause to believe a misdemeanor or felony involving danger of forcible injury to persons or property has just been committed near where the officer finds the person; (2) the officer has reasonable suspicion that the person is a material witness to that crime; and (3) the detention is reasonably necessary to obtain or verify the person's identification or to determine what the person knows about the crime. *Id.*[9]

---

[9] The *Model Code* authorizes an officer to stop and detain a person when:

"(i) The officer has reasonable cause to believe that a misdemeanor or felony, involving danger of forcible injury to persons or of appropriation of or danger to property, has just been committed near the place where he finds such person, and

"(ii) the officer has reasonable cause to believe that such person has knowledge of material aid in the investigation of such crime, and

"(iii) such action is reasonably necessary to obtain or verify the identification of such person, or to obtain an account of such crime."

§ 110.2(1)(b) at 6. The note following section 110.2 of the *Model Code* explains that subsection (1)(b)

"allows an officer coming upon the scene of a recently committed crime to 'freeze' the situation and obtain identifications and an account of the circumstances from the persons present. Thus this paragraph * * * is applicable to witnesses as well as suspects. The officer may only stop for this purpose if he has reasonable cause to believe that the crime has been committed and that the persons whom he stops have knowledge of material aid to the investigation of it."

§ 110.2 at 9-10.

The commentary to the *Model Code* discusses the rationale for section 110.2, explaining that law enforcement officers often are confronted with situations in which an officer needs "to acquire some further information from or about a person whose name he does not know, and whom, if further action is not taken, he is unlikely to find again." § 110.2 at 270 (footnote omitted). Such a person may not appear to be involved in any criminal activity, but having been found near the scene of a crime, may be a "potential source of information." *Id.* The commentary concludes that it would be "irrational" not to authorize officers responding to "confused, emergency situations" to "freeze the situation for a short time, so that [they] may make inquiry and arrive at a considered judgment about further action to be taken." *Id.* at 272 (quotation marks omitted). Professor LaFave generally agrees, asserting that the *Model Code* takes "the sensible position that the power to stop may constitutionally be extended so as to encompass the brief detention of potential witnesses in at least certain situations." LaFave, 4 *Search and Seizure* § 9.4(b) at 377. As noted, courts considering the question have reached the same conclusion with apparent unanimity, although with some variation in the circumstances in which temporary detention of a potential witness will be considered reasonable for constitutional purposes.[10]

---

[10] Cases that have followed the *Model Code* approach in the context of violent crimes include: *People v. Hernandez*, 679 NYS2d 790, 793-94, 177 Misc2d 882, 887 (NY Sup Ct 1998) (police facing a "dangerous, ongoing situation" may "reasonably stop victims and/or witnesses * * * in order to freeze the situation, render aid and/or prevent the disappearance of witnesses"); *Williamson v. United States*, 607 A2d 471, 476-77 (DC 1992) (stop reasonable where shots had been fired, the officer had reason to believe the defendant had knowledge material to the investigation, and the stop was necessary to obtain prompt account of shooting); *Wold v. State*, 430 NW2d 171, 174 (Minn 1988) ("Our court, as well as courts of other states, have recognized that in order to 'freeze' the situation, the stop of a person present at the scene of a recently committed crime of violence may be permissible without trampling on the Fourth Amendment prohibition against unreasonable search and seizure.") *Barnhard v. State*, 325 Md 602, 615, 602 A2d 701, 708 (1992) (approving "freeze" procedure discussed by LaFave and *Model Code* and holding officers at the scene of recent stabbing "had the right and the duty to seek [defendant's] identification" after he indicated he possessed material information relating to the crime); *Metzker v. State*, 797 P2d 1219, 1221 (Alaska Ct App 1990) (stop reasonable where defendant's passenger was victim of recent assault and had fled from officers before providing identification information or account of the crime, citing LaFave and § 110.2(1)(b) of the *Model Code*).

Other cases have approved of stops in circumstances in which it is less clear that the crime committed would qualify under the *Model Code*. *See, e.g., State v. Pierce*, 173 Vt 151, 157, 787 A2d 1284, 1289 (2001) (officer's stop of defendant as

We have found no jurisdiction, and defendant cites none, that rejects the basic approach endorsed by the *Model Code* and by other authorities, such as Professor LaFave.

We likewise conclude that, in appropriate circumstances, it is permissible under Article I, section 9, for officers to stop and detain someone for on-the-scene questioning whom they reasonably suspect can provide material information about a crime's commission. Both potential witnesses to and victims of a crime can be sources of valuable information that can aid officers in the field in making better informed, on-the-spot investigatory decisions about whether and who to temporarily detain or arrest, what leads to pursue, and even which physical or other tangible evidence to gather. Persons who possess material information about a crime are also sources of evidence—testimonial evidence, to be sure, but evidence just the same. Such evidence is potentially as beneficial to the defense as to the prosecution, a fact reflected in the value our legal system places on a criminal defendant's constitutional right to compulsory process and statutory subpoena powers. *See* Or Const, Art I, § 11 (accused in criminal case has right to compulsory process for obtaining witnesses in his favor); ORS 136.567 (defendant in criminal action entitled to subpoena witnesses at state expense). Knowing the identity of and the information to be provided by a witness to or a victim of a crime is as fundamental to our criminal justice system as is apprehension

---

potential witness to driving under the influence of intoxicants held reasonable); *Metcalf v. Long*, 615 F Supp 1108, 1115 (D Del 1985) (stop of vehicle justified by officers' reasonable suspicion that driver was an escaped felon who officers were searching for, or that escaped felon was a passenger in stopped vehicle, or defendant knew of felon's whereabouts). A few have drawn the line between "serious" and "minor" crimes. *See Doucette v. State*, 10 So 3d 117, 126 (Ala Crim App 2008) (Welch, J., concurring) (describing as "improper[]" the "restrain[t] [of] an individual who is * * * merely thought to have been a witness to a relatively minor crime such as in this case—knocking over mail-boxes—where there are no exigent circumstances"); *State v. LaPlante*, 2011 ME 85, ¶ 13, 26 A3d 337, 341 (Me 2011) (stop for sole purpose of seeking information about possible speeding by another vehicle was unreasonable).

Finally, consistently with the *Model Code*, a few courts have invalidated stops where the crime was too remote. *People v. Spencer*, 84 NY2d 749, 754-55, 646 NE2d 785, 788-89 (1995) (unreasonable to stop defendant as potentially having information about assault that occurred the day before). *United States v. Ward*, 488 F2d 162, 169 (9th Cir 1973) (unreasonable to stop defendant to question him as witness in general investigation that was several months old).

of a potential offender. Consistently with *Cloman,* 254 Or at 5-8, where we approved of the temporary detention of criminal suspects on reasonable suspicion, a due regard for the practical necessities of effective law enforcement, considered in tandem with a due regard for a person's protected liberty interests, equally supports the "brief, informal" investigatory detention of a potential material witness on reasonable suspicion.

We therefore hold that officers constitutionally may, in appropriate circumstances, stop and temporarily detain for questioning a person whom they reasonably believe is a potential material witness to a crime. We further agree with the basic test that the state has proposed for determining the circumstances in which such a temporary detention will be reasonable. In particular, we agree that the stop and temporary on-the-scene detention of a likely material witness will be constitutional if: (1) the officer reasonably believes that an offense involving danger of forcible injury to a person recently has been committed nearby; (2) the officer reasonably believes that the person has knowledge that may aid the investigation of the suspected crime; and (3) the detention is reasonably necessary to obtain or verify the identity of the person, or to obtain an account of the crime. In adopting those factors, we do not foreclose refinement of them in future cases involving other factual circumstances. But for purposes of analysis of this case, those considerations suffice.[11]

We turn, then, to an analysis of the particular facts of this case and the lawfulness of the officers' conduct. The officers arrived at defendant's home in response to an incomplete

---

[11] We do not decide in this case whether a temporary detention to question someone who potentially has information material to the commission of a crime is reasonable only for certain levels of offenses or ones involving personal injury or property damage. *See Model Code* § 110.2(1)(b)(i) at 6 (approving of witness detentions for crimes involving appropriation of or damage to property, as well as for forcible injury). Nor need we resolve more specifically how close the stop must be, temporally or geographically, to the commission of the crime. *See id.* (offense must have "just" been committed "near the place" where potential witness is found). Those issues are better resolved on facts that present them or pose close questions on their resolution. Here, the potential crime was an assault involving forcible personal injury, and it was either on-going when police arrived at the scene or had been very recently committed.

or aborted 9-1-1 call, which, given what the 9-1-1 dispatcher had heard, gave the officers an objectively reasonable basis to believe that a woman in the home was being assaulted. When the officers initially approached the home, defendant's husband appeared angry and was uncooperative and evasive. Those observations gave the officers further reason to believe that a violent domestic disturbance was occurring and that the situation within the house remained potentially dangerous.[12] They knocked at the front door, and when both defendant and her husband answered it, the officers immediately observed a large swollen area over defendant's right eye.

The officers then ordered defendant and her husband onto the porch of their home, where the officers separated them by directing defendant to stay where she was on the porch, while arresting and moving her husband to the far side porch, about 20 feet away. In taking that action, the officers had probable cause (not just reasonable suspicion) to believe that defendant's husband had assaulted her. Ordering the two from their home not only significantly intruded on their liberty interests, but also invaded their privacy interests in the sanctity of their home. As such, under *Dahl,* the officers' conduct not only was a seizure, but it was one that, to be reasonable, ordinarily requires a warrant. 323 Or at 206-07, 209. Here, however, the circumstances created a patent exigency excusing a warrant: there had been an aborted 9-1-1 call; the officers' observations at the scene suggested that they had arrived in the middle of a domestic assault; defendant's husband had taken evasive action to retreat into the home when he first saw the officers; and

---

[12] Worth noting is that, until the officers arrived at the scene and gained those confirming observations, either of two crimes might have been involved: a domestic assault (which, depending on the circumstances and severity, could violate any of several statutes) or initiating a false report, ORS 162.375, a Class C misdemeanor. If the officers' observations had immediately dispelled any reasonable suspicion that a domestic assault had occurred or was occurring, and instead had provided only a basis to believe that a false report had been made, under the *Model Code* approach, the officers would not have been able to temporarily detain and question either defendant or her husband to investigate that possible crime because it would not have been a crime involving injury to person or property, as the *Model Code* requires. § 110.2(1)(b)(i) at 6. We need not decide whether our constitutional provision requires that same limitation, however, because here, the officers in fact had reasonable suspicion that the crime committed was a personal assault.

when he and defendant answered the door, defendant appeared to have been assaulted. Although defendant and her husband answered the officers' knock by opening the door, the husband was still in a position to harm defendant further, to slam the door shut and evade arrest, or to otherwise escalate into physical confrontation. Such exigent circumstances justified ordering defendant and her husband onto the porch, for purposes of taking control of the unpredictable and potentially violent situation, and to take defendant's husband into custody.

We further conclude that the officers, having taken that lawful action, could also detain defendant temporarily for purposes of investigation. The officers' observations and information up to that point gave them an objectively reasonable basis to believe that defendant was a victim of a domestic assault that had just occurred at the home and likely possessed information material to that crime. The officers did not know defendant's identity. They did not know what defendant could tell them about the circumstances of the aborted 9-1-1 call. They did not know any number of things relevant to their investigation that defendant likely could tell them, such as how the domestic assault began and escalated, how defendant's injury occurred, the presence of others (*e.g.*, children) in the home, and past incidences of violence between defendant and her husband.[13] Directing

---

[13] In this particular context, the general reasonableness of those and similar inquiries is bolstered by the special duties that the legislature has placed on officers responding to incidents of domestic abuse. By the time the officers ordered defendant and her husband to step out of their home and onto their porch, the officers had probable cause to believe that there had been an assault between household members, and probable cause to believe that defendant's husband was the assailant. But that does not mean that a responsible on-the-scene investigation could not continue in an effort to confirm or dispel what the officers reasonably suspected or had probable cause to believe had happened. In domestic violence situations, ORS 133.055(2)(c) specifically charges investigating officers with making "every effort" to determine who was "the assailant or potential assailant," even after an arrest has been made. In doing so, officers have a duty to consider, if the information is "reasonably ascertainable," the history of domestic violence between the persons involved; whether any alleged crime was committed in self-defense; and the potential for future assaults. ORS 133.055(2)(c)(A) - (D). Officers are further required to "use all reasonable means to prevent further abuse" of a person they believe to be a victim of domestic abuse, "including advising each person of the availability of a shelter or other services in the community and giving each person immediate notice" in writing of an extensive list of rights and remedies as specified by statute. ORS 133.055(3).

defendant and her husband to remain on the porch, while the officers kept defendant separate from her husband, who appeared to have recently assaulted her and who was directing her to not cooperate with the officers, was a reasonable way for them to "freeze" the situation, try to determine and verify defendant's identity, clarify what had happened, and take appropriate next steps based on the course of the investigation. As we have already concluded, those actions amounted to a coercive detention of defendant, and consequently were a seizure for constitutional purposes. They were, however, also constitutionally permissible actions for the officers to take.[14]

Defendant argues, however, that even if officers could constitutionally stop and detain her for questioning as a potential witness to and victim of a crime, the stop was nevertheless unlawful for two reasons. First, defendant argues, there was no emergency that called for the officers to have defendant stay where she was on the porch for questioning once her husband had been "neutralized." At that point, according to defendant, the officers had no reason to believe that defendant would flee or that defendant's memory would fade. Nor did defendant appear to have an injury requiring aid or assistance. In defendant's view, therefore, there was no reason for the officers not to simply "come back later to talk to defendant" and seek her voluntary cooperation. Defendant therefore argues that, once her husband was isolated at the far end of the porch, the officers could not reasonably detain and question defendant at all.

That argument disregards the essential rationale that makes such a stop constitutionally permissible, however. The officers did not know defendant's identity; they did not know what she could tell them about the aborted 9-1-1 call or her apparently recent injury. The officers were, in the words of the *Model Code* commentary, confronted with a "confused,

---

[14] The Court of Appeals did not consider the lawfulness of the seizure as an independent inquiry. Instead, the court appeared to proceed from the premise that any seizure of a person as a potential witness rather than as a criminal suspect— even if brief and for limited questioning—was *per se* unlawful under Article I, section 9. With our holding in this case, we reject that apparent implicit premise of the court's analysis.

emergency situation[.]" § 110.2 at 272. Moreover, whatever the officers' initial observations, and however objectively reasonable their initial beliefs about what had occurred and defendant's and her husband's respective roles, officers are not constitutionally compelled to halt an on-the-scene investigation when their suspicions rise to a particular level. *See State v. Taylor*, 249 Or 268, 272, 437 P2d 853 (1968) ("Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." (internal quotation mark omitted; quoting with approval *Hoffa v. United States*, 385 US 293, 310, 87 S Ct 408, 17 L Ed 2d 374 (1966))). As long as the officers' actions were constitutionally reasonable, they were entitled to continue their on-the-scene investigation to confirm, dispel, or otherwise further inform the scope and course of the investigation.

To that end, it was reasonable for the officers to "freeze the situation for a short time, so that [they could] make inquiry and arrive at a considered judgment about further action to be taken." *Model Code* § 110.2 at 272 (internal quotation marks omitted). As the United States Supreme Court has cautioned, the Fourth Amendment protection against unreasonable seizures of a person "is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review." *Atwater*, 532 US at 347 (so observing in the context of arrests made in the field without a warrant). That observation applies with equal force under Article I, section 9. Our constitutional provision, likewise, would not be well served by an analysis that too readily second-guesses officers in the field on the need for further on-the-scene investigation and questioning of potential witnesses. *See generally State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987) (officers in field must have considerable latitude to take reasonable safety precautions in investigation of crime due to split-second decision required and difficulty of weighing magnitude of need against intrusiveness of protective measures).

Defendant also argues that the officers exceeded the scope of a reasonable investigation by checking law enforcement records for any outstanding warrants and asking defendant whether she had been previously arrested and then, when she said yes, asking her on what charge. Under the particular facts of this case, however, those inquiries were reasonably necessary to determine defendant's identity. The officer who questioned defendant had difficulty verifying her identity. She did not have any form of identification to show him. Nor could dispatch identify her as a licensed driver; in fact, as she confirmed for the officer, defendant had never had a driver's license. Dispatch could tell the officer only that their records showed that law enforcement had had "some form of contact" with a person with defendant's maiden name. Asking defendant if she had ever been arrested thus served two purposes reasonably related at that point to the reasons for temporarily detaining defendant. First, it potentially validated defendant's identity by verifying the information in the database. Second, asking what the arrest had been for was a reasonable way to ascertain whether defendant had a prior history of domestic violence. *See* ORS 133.055(2)(c) (discussed earlier, 353 Or at 611 n 13). When the officers learned that defendant's arrest had not been for a domestic violence incident, that fact helped to confirm the officers' decision to arrest defendant's husband as the assailant. We therefore conclude that the two questions that the officer asked defendant about whether she had been arrested did not exceed the permissible scope of the stop, or render the otherwise lawful stop unreasonable.[15]

## III.   CONCLUSION

In summary, we hold that defendant was seized by the officers' directives to step out of her home and remain on her front porch because those directives were a show of

[15] After attempting to determine and verify defendant's identification, the officer continued his interview by asking defendant about the circumstances of the assault and the 9-1-1 call. The orange syringe cap fell from defendant's pant leg as the officer asked defendant if she felt threatened by her husband during their argument. Because we conclude that the officer's inquiries were lawful, we need not determine whether there was a sufficient relationship between them and the evidence that the officer later discovered. *See generally State v. Rodriguez*, 317 Or 27, 39, 854 P2d 399 (1993) (suppression depends on nature of connection between unlawful police conduct and evidence sought to be suppressed).

authority that would cause a reasonable person in defendant's circumstances to believe that her liberty had been significantly restricted. We also hold, however, that the seizure of defendant was reasonable under Article I, section 9. In ordering defendant and her husband to step out of their home and onto their porch, the officers did so with probable cause to believe that defendant's husband had just assaulted her and under exigent circumstances that arose in the context of the officers' emergency response to an apparent incident of domestic violence. In ordering defendant to stay on the porch, the officers acted reasonably in temporarily detaining her for purposes of questioning her as a witness to and victim of a recent or ongoing assault. The officers had an objectively reasonable basis to obtain and verify defendant's identity and an objectively reasonable belief that defendant could provide information material to the assault. The trial court therefore correctly denied defendant's motion to suppress evidence discovered in the subsequent consensual search of her person, contrary to the decision of the Court of Appeals.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.