No. 45          September 14, 2017          805

## IN THE SUPREME COURT OF THE STATE OF OREGON

In the Matter of K.A.M.,
a Youth.

STATE OF OREGON,
*Respondent on Review,*

*v.*

K.A.M.,
*Petitioner on Review.*

(CC 070424JB; CA A154130; SC S064469)

On review from the Court of Appeals.*

Argued and submitted May 12, 2017.

Christa Obold-Eshleman, Portland, argued the cause and filed the briefs for petitioner on review.

Jonathan N. Schildt, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Marsha Levick, Juvenile Law Center, Philadelphia, Pennsylvania, and Roy Pulvers, Holland & Knight LLP, Portland, filed the brief for *amicus curiae* Juvenile Law Center.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Nakamoto, Flynn, and Duncan, Justices.**

KISTLER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court.

_____

\* On appeal from Jackson County Circuit Court, Patricia Crain, Judge. 279 Or App 191, 379 P3d 686 (2016)

\*\* Brewer, J., retired June 30, 2017, and did not participate in the decision of this case.

**KISTLER, J.**

The question in this case is whether youth was stopped during the search of a drug house when a detective came upon youth and a friend in one of the bedrooms, told youth's friend to "stay off the meth," asked them their names, and then asked whether they had anything illegal on them. Because the trial court ruled that no stop occurred, it denied youth's motion to suppress evidence discovered during the encounter. The Court of Appeals upheld that ruling, agreeing that no stop had occurred. *State v. K.A.M.*, 279 Or App 191, 379 P3d 686 (2016). Because we conclude that a stop occurred, we reverse the Court of Appeals decision and the trial court's judgment. We remand the case to the trial court for further proceedings.

We take the facts from the hearing on youth's suppression motion and state them consistently with the trial court's ruling.[1] Five Medford police and probation officers were conducting a "parole sweep," looking for persons who had violated their probation or parole. The officers had information that a suspected parole violator was in a single-family house on 11th Street and went to the house looking for her. A person who had rented the house gave the officers permission to look through it. One of the officers, Detective Schwab, testified that the house was a known drug house. When asked to describe the condition of the house, Schwab testified that it was "dilapidated," with personal property strewn everywhere. He added, "It looked like a typical—I mean, for [lack of] better words, it looked like a drug house."

All five officers went through the house looking for the suspect. While four of the officers were searching other parts of the house, Schwab went into a back bedroom. He was dressed in plain clothes, except for a raid vest that said "POLICE" on it. In the bedroom, he found youth and a young woman, who were waiting there to find out if they could live in the house for awhile. According to Schwab's testimony, he did not explain to youth or the young woman why he and the other officers were searching the house or why he had

---

[1] Youth did not ask the Court of Appeals to review the trial court's factual findings *de novo*. *See* ORS 19.415(3)(b). Rather, he specifically accepted the trial court's express and implicit factual findings.

come into the bedroom. Rather, he testified that he entered the bedroom, noticed that both of them appeared to be under the influence of a stimulant, asked them their names, and asked if they had anything illegal on them. At that point, youth said that he had a pipe on him. Schwab asked youth if he would produce it, which he did. The pipe contained methamphetamine residue.

The young woman testified to a different version of events, part of which the trial court credited. Specifically, the court credited her testimony that, "when Schwab came into the room, all of the other detectives, officers, whoever they were, were going through the rest of the house." It also credited her testimony that, when Schwab came into the bedroom, he told her she "need[ed] to stay off the meth" before asking youth and the young woman their names. Given that evidence, the trial court found:

> "Clearly, there were not five officers in the room. According to [the young woman], it was just Officer Schwab. That he walked in and he said, 'You need to stay off the meth.' And then asked if they had anything.

> "So at that point, there was no particular coercion. There was no particular indication that the parties were not free to leave. So it looked to me like a conversation, not a stop. And [youth] volunteered, yeah, here's a pipe."

The court accordingly denied youth's motion to suppress the pipe without deciding whether Schwab reasonably suspected that youth and the young woman had committed or were committing a crime. Considering the pipe and other evidence, the trial court found youth within the jurisdiction of the court for having committed acts that, if committed by an adult, would constitute methamphetamine possession. The court entered judgment accordingly.

Youth appealed from the judgment, assigning error to the trial court's ruling denying his suppression motion. Before the Court of Appeals, youth argued that his personal characteristics—17 years old and homeless—should be considered in determining whether he reasonably perceived that Schwab had stopped him. *K.A.M.*, 279 Or App at 194-95. The Court of Appeals disagreed. *Id.* at 195. Relying on an earlier Court of Appeals decision, the court explained

that, "[a]bsent some other show of authority, a person is not seized when an officer asks to see a person's identification and asks whether the person has anything illegal in his or her possession." *Id*. It followed, the court concluded, that youth was not stopped in this case. The Court of Appeals accordingly upheld the trial court's ruling on his suppression motion and the resulting judgment.

On review, youth raises two issues. First, relying on *J.D.B. v. North Carolina*, 564 US 261, 131 S Ct 2394, 180 L Ed 2d 310 (2011), he argues that, in determining whether he was stopped for the purposes of Article I, section 9, of the Oregon Constitution, we should consider that he was not yet 18 years old and thus was more impressionable than an adult.[2] Second, he contends that, even if he were viewed as an adult, a reasonable adult would not have felt free to leave in the circumstances in which youth and his friend found themselves. We begin with the first issue that youth raises.

We do not foreclose considering a youth's age as part of the reasonableness inquiry. *See J.D.B.*, 564 US at 271-72 (holding that courts should consider a youth's age in determining a Fifth Amendment *Miranda* issue).[3] However, this is hardly the case in which to resolve that question under Article I, section 9. That is so for at least three reasons. First, youth did not preserve the issue in the trial court. He never asked the trial court to factor his age into the determination of how a reasonable person would have perceived Schwab's actions. Second, youth was 17 years and 9 months old when Schwab encountered him in the drug house. Even

---

[2] On review, youth argues that Schwab stopped him without reasonable suspicion in violation of both Article I, section 9, and the Fourth Amendment. However, youth did not raise a Fourth Amendment argument in the Court of Appeals. Having lost in that court, he cannot rely on the Fourth Amendment as a basis for reversing the Court of Appeals decision. *See State v. Ghim*, 360 Or 425, 443, 381 P3d 789 (2016).

[3] The holding in *J.D.B.* is narrow. The Court emphasized the limited inquiry that its holding required:

"[A] child's age, when known or apparent, is hardly an obscure factor to assess. *** [O]fficers and judges need no imaginative powers, knowledge of developmental psychology, training in cognitive science, or expertise in social and cultural anthropology to account for a child's age. They simply need to know that a 7-year-old is not a 13-year-old and neither is an adult."

564 US at 279-80.

under *J.D.B.*, which youth asks us to follow, he would be regarded as an adult, not a child. *See id.* at 277 (citing Justice O'Connor's concurring opinion in *Yarborough v. Alvarado*, 541 US 652, 124 S Ct 2140, 158 L Ed 2d 938 (2004), for that proposition and agreeing with the dissent in *J.D.B.* that "'teenagers nearing the age of majority' are likely to react to an interrogation as would a 'typical 18-year-old in similar circumstances'"). Third, the stop inquiry requires an evaluation of the totality of the circumstances: in this case, circumstances other than youth's age lead us to conclude that he reasonably perceived that he was not free to leave.

We accordingly leave for another day the first issue that youth urges us to decide and turn to the second issue that he raises—whether a reasonable person, regardless of age, would have felt free to leave. On that issue, this court recently explained that a police officer's request for identification is, in and of itself, not a sufficient show of authority to constitute a stop. *State v. Backstrand*, 354 Or 392, 412, 313 P3d 1084 (2013) (stating that proposition). However, the court was careful to add that

> "when the content of the questions, the manner of asking them, or other actions that police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain the citizen, then the encounter rises to the level of a seizure."

*Id.* As the court also noted in *Backstrand*, that "inquiry necessarily is fact specific and requires an examination of the totality of the circumstances involved." *Id.* at 399.

In this case, Detective Schwab's entry into the bedroom, the lack of any explanation for his presence, and his apparent accusation that the young woman was using methamphetamine persuade us that a reasonable person would perceive that Schwab was exercising his authority to detain both youth and the young woman. More specifically, according to the evidence that the trial court credited, youth and the young woman were in the bedroom of the house when Schwab and four other officers entered the house and began searching it. Schwab then walked into the bedroom without any explanation for his presence. To be sure, Schwab

testified at the suppression hearing that the renter had given the officers permission to look through the house for a suspected parole violator. But Schwab never communicated that information to either youth or the young woman.

Ordinarily, police officers do not walk into a person's bedroom uninvited or, if they do, not without some explanation as to why they are there. That is, however, precisely what Detective Schwab did. He simply walked into the bedroom where youth and the young woman were, and the first words out of his mouth were to tell the young woman, "You need to stay off the meth." Both Schwab's unexplained entry into that private space and his accusation that the young woman was using or had recently used methamphetamine created a coercive atmosphere that reasonably conveyed that she and youth were suspected of illegal drug use and were not free to leave until Schwab had completed his inquiry. Two other circumstances support that understanding. Schwab asked whether youth and the young woman had anything illegal on them, a question that, given Schwab's prior accusation of methamphetamine use, reasonably added to the coercive pressure. And the young woman was aware (and so presumably was youth) that, although Schwab was the only officer who had come into the bedroom, other officers were searching through the house. The officers' unexplained presence in the house added to the coercive effect of Schwab's presence in the bedroom.

In those circumstances, youth reasonably concluded that Schwab had stopped him—that is, that Schwab was exercising his authority to detain him. In reaching that conclusion, we note that this is not a case in which an officer asked a person for identification for the apparent purpose of getting the person to leave a place where he or she was not authorized to be. *Cf. Backstrand*, 354 Or at 415 (explaining that, when an officer noticed a person who appeared to be a minor in an "adult bookstore," a request for identification was not a stop; at most, the person's answer would have led to the person's being asked to leave the store); *State v. Ehly*, 317 Or 66, 78, 854 P2d 421 (1993) (explaining that the officers' request to look for and return a motel room key, viewed in light of the motel manager's and the

officers' prior requests that the defendant leave the premises, did not constitute a seizure). Nor is this a case in which an officer approached a person who had arrived at a house being searched by the police, explained to the person why the officer had approached him, and then asked the person his name and connection to the house. *Cf. State v. Anderson*, 354 Or 440, 452-53, 313 P3d 1113 (2013) (reasoning that, in those circumstances, the request for information did not constitute a seizure). Finally, this is not a case in which an officer approached the driver of a parked car while his passengers (the defendant and a companion) walked away, later returned of their own accord, and responded to the officer's request for identification after returning. *Cf. State v. Highley*, 354 Or 459, 469, 313 P3d 1068 (2013) (relying on the officer's focus on the driver, the defendant's exercise of his freedom to walk away from the officer, and his unilateral decision to return, in concluding that the officer's request for identification did not constitute a stop).

As explained above, two circumstances combine in this case to reinforce the conclusion that the detective's actions constituted a stop. The first is the place where the encounter occurred: Detective Schwab walked into a bedroom where he found youth and the young woman. *See State v. Fair*, 353 Or 588, 600-01, 302 P3d 417 (2013) (explaining that an officer's actions taken within a house can have a more coercive effect than actions taken in public places). We recognize that youth and the young woman were not yet residents of the house when Schwab walked in on them in the bedroom. Rather, they were there waiting to learn if they could stay there, and their right to privacy was derivative of the person who had rented the home. *See State v. Tanner*, 304 Or 312, 321, 745 P2d 757 (1987) (discussing relative rights of owners and guests). However, youth and the young woman reasonably viewed the coercive effect of Schwab's unexplained entry into the bedroom as if he had entered the bedroom without authority.

The second factor is what Schwab said. After entering the bedroom, he told the young woman that she needed to "stay off the meth." He effectively accused her of being on or using methamphetamine—a statement that, in the context in which it was made, would cause a reasonable

person to conclude that he or she was not free to leave until Schwab had finished his inquiry. *See State v. Jackson*, 268 Or App 139, 146, 342 P3d 119 (2014) (following line of Court of Appeals decisions holding that telling a person he or she has committed an offense can constitute a stop). Because we hold that Schwab's actions constituted a stop, the remaining issue is whether the stop was justified—namely, whether Schwab reasonably suspected that youth and the young woman had engaged or were engaging in criminal activity. On that issue, the state argues that there are potentially disputed issues of fact that the trial court did not resolve and asks us to remand the case to the trial court if we conclude a stop occurred. We accordingly do so.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court.