Argued and submitted October 31, 2018, affirmed November 27, 2019

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GREGORY KUEHNE,
*Defendant-Appellant.*

Coos County Circuit Court
16CR67858; A164033

454 P3d 797

Defendant appeals a judgment of conviction for one count of possession of methamphetamine, ORS 475.894. Defendant assigns error to the trial court's denial of his motion to suppress evidence, arguing that he was unlawfully seized when, while he was walking in the travel lane of a rural two-lane county road, a police officer (1) parked his patrol car partially in the roadway 150 feet in front of defendant, such that the front of the officer's patrol car was facing defendant, (2) activated the patrol car's rear overhead lights to alert traffic that the roadway was partially obstructed, and (3) asked defendant whether defendant was high and what was in defendant's pocket. *Held*: The trial court did not err. Considering the totality of the circumstances in this case, a reasonable person in defendant's position would not understand the officer to have intentionally and significantly restricted, interfered with, or otherwise deprived defendant of his liberty or freedom of movement.

Affirmed.

Martin E. Stone, Judge.

Erin J. Snyder Severe, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Lauren P. Robertson, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jennifer S. Lloyd, Assistant Attorney General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

TOOKEY, J.

Affirmed.

**TOOKEY, J.**

Defendant appeals a judgment of conviction for possession of methamphetamine, ORS 475.894, arguing that the trial court erred in denying his motion to suppress evidence. Specifically, defendant argues that the trial court should have granted his motion to suppress evidence because he was unlawfully seized under Article I, section 9, of the Oregon Constitution. For the reasons that follow, we affirm.

## I.   STANDARD OF REVIEW

"We review the denial of a motion to suppress for errors of law." *State v. Brown*, 293 Or App 772, 774, 427 P3d 221 (2018). "We are bound by the trial court's express and implicit factual findings so long as they are supported by the record." *Id.* We state the facts in accordance with our standard of review.

## II.   HISTORICAL AND PROCEDURAL FACTS

One dark evening, around 5:30 p.m., Coos County Sheriff's Deputy Smith was dispatched to a report of a "traffic hazard" created by someone pushing a shopping cart in the "travel lane" of Libby Lane, a rural two-lane county road. Libby Lane has no sidewalk and a "very small" shoulder with "not a lot of room on the side of the road."

When Smith arrived, he drove past and observed defendant in the eastbound lane of Libby Lane with a shopping cart. Smith turned his car around and stopped in the westbound lane, approximately 150 feet away from defendant, such that the front of Smith's patrol car was pointed toward defendant. At the section of Libby Lane where Smith stopped his car, the shoulder was narrow. As a result, Smith's car was partially obstructing the westbound lane. Smith turned on his rear overhead lights to warn traffic approaching in the westbound lane that the roadway was partially obstructed. Smith's rear overhead lights flash red and blue and would have been visible to someone behind his car, such as drivers approaching in the westbound lane. Although Smith's rear overhead lights were not directed toward the front of his car, someone in front of Smith's car, as defendant was, could see the flashing lights.

After Smith stopped his patrol car, he made contact with defendant "to see what he was doing and if he was okay," and "why he was in the middle of the road."[1] Smith and defendant approached each other, and defendant said "hi" to Smith. Smith recognized defendant from prior contacts, which, according to defendant, were nonhostile and "not bad run ins." Smith recalled that defendant had previously told Smith that defendant uses methamphetamine. Smith asked defendant, "Are you high?" During the hearing on defendant's motion to suppress, Smith explained that he asked defendant whether defendant was high "because of [Smith's] knowledge of [defendant] and [defendant's] previous admissions to [Smith] of using methamphetamine[,] and the fact that it was dark and [defendant] was in the middle of the road pushing a shopping cart." Defendant told Smith that he was not high and that the last time he had used methamphetamine was three weeks earlier.

As Smith was talking to defendant, Smith noticed a "large bulge" in the front left pocket of defendant's pants. Smith did not know what the bulge was. So, Smith asked defendant, "What's in your pocket?" In response, defendant reached into his pocket and pulled out a "handful of random items," including a "very small plastic box that you could see through." In the plastic box, Smith could see folds of a plastic "[Z]iploc baggy." Smith testified that, based on his training and experience, he believed the Ziploc bag contained controlled substances.

Defendant then took the "entire handful of items" and "crammed them all right back into his pocket." Smith told defendant that he had seen the box and asked defendant to take the box back out of his pocket. Defendant slowly took each individual item out of his pocket until he had taken everything out of his pocket except for the box and he denied having the box. Believing that the box contained a controlled substance, Smith then reached into defendant's pocket and pulled the box out. Smith then opened the box. It

_____

[1] Smith's subjective intent and state of mind "do not control the analysis," but "have some relevance *** insofar as they reflect a state of mind that is consistent with [his] objective actions, his behavior, and the overall context of the encounter." *State v. Backstrand*, 354 Or 392, 414 n 18, 313 P3d 1084 (2013).

contained a "crystal substance," which later tested positive for methamphetamine.

Before trial, defendant moved to suppress the methamphetamine evidence and his statements to Smith, arguing, among other points, that the trial court should suppress the evidence because Smith unlawfully stopped defendant. The state, for its part, argued, among other points, that Smith's contact with defendant was not a stop, but merely "casual contact."

The trial court concluded that Smith did not stop defendant. It found that defendant "was not walking near *** what would be the fog line" but "was walking *** farther out in the roadway." The trial court next determined that because Smith would be "somewhat suspicious" about the judgment of someone who was "pushing a shopping cart inside the travel lane," and because Smith recognized defendant as a "methamphetamine user," Smith could ask defendant, "Are you high?" The trial court also determined that Smith's interaction with defendant did not become a stop when Smith asked defendant, "What's in your pocket?," after noticing the bulge in defendant's pocket. Finally, the trial court determined that, based on Smith seeing the plastic box with the "folding plastic bag" and defendant's admission to using methamphetamine three weeks earlier, Smith had "probable cause to believe [that defendant] was in possession of methamphetamine," and, accordingly, Smith "could reach in and *** grab [the box] out of [defendant's] pocket."

Defendant waived his right to a jury trial. After the suppression hearing, defendant was convicted by the trial court.

### III.   ANALYSIS

"Article I, section 9, protects individuals against unreasonable searches and seizures." *State v. Nelson*, 294 Or App 793, 796, 433 P3d 370 (2018). "The Supreme Court has recognized three categories of police-civilian encounters: (1) a mere encounter; (2) a stop; and (3) an arrest." *State v. Leiby*, 293 Or App 293, 296, 427 P3d 1141 (2018) (citing *State v. Backstrand*, 354 Or 392, 399, 313 P3d 1084 (2013)). "Mere encounters—sometimes referred to as mere

conversation—are noncoercive encounters that do not impli-
cate Article I, section 9." *Id.* Law enforcement officers are
"free to approach persons on the street or in public places,
seek their cooperation or assistance, request or impart infor-
mation, or question them without being called upon to artic-
ulate a certain level of suspicion in justification if a partic-
ular encounter proves fruitful." *Backstrand*, 354 Or at 400
(internal quotation marks omitted). "[T]he constitutional
concern is with police-imposed restraints on citizen liberty,
not with limiting contacts between police and citizens." *Id.*
"[N]ot every action by an officer to stop and engage a citizen
is constitutionally cognizable as a seizure." *State v. Fair*, 353
Or 588, 594, 302 P3d 417 (2013).

"In contrast to mere encounters, both stops and
arrests are seizures for constitutional purposes." *Leiby*, 293
Or App at 296 (internal quotation marks and brackets omit-
ted). In *Backstrand*, the Supreme Court explained,

> "What distinguishes a seizure (either a stop or an arrest)
> from a constitutionally insignificant police-citizen encoun-
> ter is the imposition, either by physical force or through
> some show of authority, of some restraint on the individu-
> al's liberty. The test is an objective one: Would a reasonable
> person believe that a law enforcement officer intentionally
> and significantly restricted, interfered with, or otherwise
> deprived the individual of his or her liberty or freedom of
> movement."

354 Or at 399 (internal quotation marks and citation
omitted).

"Whether a particular encounter constitutes a stop
is fact-specific and requires an examination of the totality
of the circumstances involved, and we consider all of an offi-
cer's actions as a whole greater than the sum of its parts."
*Nelson*, 294 Or App at 797 (internal quotation marks and
brackets omitted). "At the very least, to effect a stop, some
exercise of coercive authority by the officer is required."
*Id.* (internal quotation marks omitted). "The officer must
explicitly or implicitly 'convey to the person with whom he
is dealing, either by word, action, or both, that the person is
not free to terminate the encounter or otherwise go about
his or her ordinary affairs.'" *Id.* (quoting *Backstrand*, 354
Or at 401). "If, by 'the content of the questions, the manner

of asking them, or other actions that police take (along with the circumstances in which they take them)' a reasonable person would understand that an officer is exercising their authority to detain, the encounter rises to the level of a stop." *Id.* (quoting *Backstrand*, 354 Or at 412). However, "a show of authority does not exist simply because police officers convey their official status through uniforms, badges, or marked cars, or because an individual feels obliged to cooperate with the officer simply because of the officer's status." *State v. Radtke*, 272 Or App 702, 707-08, 358 P3d 1003 (2015) (internal quotation marks omitted). "The fact that the citizen is discomforted by an officer's approach and request for assistance or information—either because the officer is a known police officer, or because the encounter otherwise involves inconvenience or annoyance—does not make the contact a seizure." *Backstrand*, 354 Or at 400 (internal quotation marks omitted).

On appeal, defendant argues that "the totality of the circumstances would have conveyed to a reasonable person in defendant's position that Smith had significantly deprived him of his liberty or freedom of movement." In support of that argument, defendant points to Smith's use of his patrol car's rear overhead lights, and contends that,

> "[a]lthough Smith had turned on his rear lights for the purposes of alerting oncoming traffic to his presence, a reasonable person in defendant's position would have understood that the lights were directed [at] him. That is because defendant had not indicated that he was in need of assistance and, by parking on the opposite shoulder from defendant, a reasonable person in defendant's position would not believe that Smith had used his lights because of a concern that *defendant* presented a safety hazard to oncoming traffic by being in the roadway."

(Emphasis in defendant's brief.)

Additionally, defendant points to Smith's conversation with defendant. Specifically, defendant contends that "a reasonable person in defendant's position would believe that he was the subject of a criminal investigation" because

> "Smith never explained that he was there to follow up on the report that defendant posed a traffic hazard or warn

defendant about that safety problem. Instead, Smith asked
defendant if he was high and, after defendant denied being
high and explained that he had not used for three weeks,
Smith implicitly refused to accept defendant's explanation
by inquiring about the bulge in defendant's pants pocket."

In defendant's view, "[a]n officer may convey to a reasonable
person that he or she is the subject of a criminal investiga-
tion by asking about criminal conduct and not accepting the
person's responses to those questions."

The state, for its part, contends, among other points,
that defendant was not stopped. In the state's view, an "offi-
cer's use of emergency flashing lights for safety purposes
ordinarily is not a seizure because a reasonable person
would not understand it to be a significant restriction on
his or her liberty," and Smith's inquiries "did not indicate to
defendant that [Smith] would have insisted on an answer
or would not have allowed defendant to leave," even though
they may have reflected "a subjective belief that defendant
had something illegal on his person."

The Supreme Court has observed that the "line
between a mere encounter and something that rises to the
level of a seizure does not lend itself to easy demarcation,"
*Backstrand*, 354 Or at 399 (internal quotation marks omit-
ted), and this case, to be sure, is a close one. Nevertheless,
considering the totality of circumstances, we conclude that
Smith did not stop defendant prior to defendant pulling the
box containing methamphetamine from his pocket.

Here, Smith was dispatched because it was reported
that defendant was creating a traffic hazard by pushing a
shopping cart in the travel lane of a rural county road on
a dark evening. Smith parked his car 150 feet away from
defendant, on the opposite side of the road, with the front
of his car facing defendant. Because there was only a "very
small" shoulder along the road, Smith's patrol car was par-
tially in the westbound traffic lane. Accordingly, Smith acti-
vated his rear overhead lights to warn traffic approaching in
that lane that Smith's car was in the road. Although Smith's
lights were not directed at defendant and were not used to
"pull over" defendant, defendant could see the lights. Under
the circumstances, Smith's approach was the only practical

way for Smith to have an exchange with defendant. *See Fair*, 353 Or at 598 (observing that practical realities can inform what constitutes a "socially intrusive exercise of police authority").

Defendant and Smith then approached each other, and defendant said "hi" to Smith. Smith recognized defendant from prior contacts, which were nonhostile and "not bad run-ins." Knowing that defendant had previously admitted to using methamphetamine, Smith asked defendant whether he was "high." When defendant denied being high, Smith did not press him further. Instead, as they were talking, Smith noticed a large bulge in defendant's pocket and did not know what it was, so Smith asked defendant what it was.

In those circumstances, a reasonable person in defendant's position would not understand Smith to have "intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement." *Backstrand,* 354 Or at 399. A person seeing light from the *back* of a police car that is stopped partially in the road 150 feet away on a dark evening, when the person is in *front* of the police car and on the opposite side of the road, would not interpret that light as being "directed" at them, as defendant contends, but instead would understand the safety necessity to illuminate the vehicle when it is stopped partially in the road and it is dark outside. *See State v. Blair/Vanis*, 171 Or App 162, 171, 14 P3d 660 (2000), *rev den*, 332 Or 137 (2001) (observing overhead flashing lights on "police and tow vehicles * * * often are activated" to alert "other drivers to their presence and to the fact that a hazard exists at the roadside," and that "[t]here is nothing uncommon or psychologically intimidating about such a setting generally"). Furthermore, a person would not understand a police officer's use of emergency lights for safety purposes—at least when the officer's car is parked partially in the road, on the opposite side of the road, approximately 150 feet away, it is dark outside, and the emergency lights are not directed at the person but pointed in the other direction—as an "exercise of coercive authority by the officer," *Nelson*, 294 Or App at 797 (internal quotation marks omitted), particularly when the location of the encounter

necessitates that the officer park the officer's car partially in the roadway, *see State v. Gerrish*, 311 Or 506, 508-09, 513, 815 P2d 1244 (1991) (officer did not seize defendant, because a reasonable person would not understand the officer's actions to be "a significant restriction upon or interference with an individual's liberty or freedom of movement," where the officer had his patrol car's overhead lights on and "flagg[ed] defendant down directing him to stop," so that the officer could inquire as to whether defendant had "witnessed [a] shooting/robbery" or "possibly find the perpetrator" of that crime, and the officer's actions "were the only means available to get defendant's attention long enough to request information").

Moreover, although Smith's questions to defendant may not have been the type of questions that "one private citizen ordinarily would *** ask another," given the circumstances presented here, the "*content* of [those] questions did not cause defendant to be seized." *State v. Ashbaugh*, 349 Or 297, 302, 316-17, 244 P3d 360 (2010) (emphasis in *Ashbaugh*) (the defendant was not stopped when an officer asked her "if she had anything illegal in her purse," the defendant replied that she did not, and the officer then asked the defendant if he could search her purse). That is because, ordinarily, "[a]n individual is not stopped *** when an officer makes statements conveying possible suspicion" or when "an officer makes only 'an *inquiry* about criminal activity.'" *Nelson*, 294 Or App at 797 (quoting *State v. Allen*, 224 Or App 524, 531, 198 P3d 466 (2008) (emphasis in *Allen*)); *see also State v. Baker*, 154 Or App 358, 360, 362, 961 P2d 913, *rev den*, 327 Or 553 (1998) (the defendant not seized when an officer saw him coming out of a known "crack house" and asked him, "So Craig, did you buy any good crack in there?," because the officer "asked defendant a question" and "did not announce that he had seen defendant break the law"). In that regard, we note that Smith did not directly accuse defendant of committing a violation or a crime, or make a statement that was tantamount to an announcement that he had seen defendant break the law. *Nelson*, 294 Or App at 797 ("[W]hen an officer makes a direct and unambiguous accusation that an individual has committed a violation or crime, the officer has stopped that individual." (Internal

quotation marks omitted.)); *see also Allen*, 224 Or App at 531 (officer seized the defendant when he told her that he "*knew* she was coming from a dope house" and "that if she was honest and gave [him] *the* dope [he] would give her a citation," because the officer's statements were tantamount to an announcement that "the officer had just seen defendant break the law" (emphases and brackets in *Allen*)). Nor did Smith communicate to defendant that he was the subject of a traffic stop. *Backstrand*, 354 Or at 406-07 (observing "a person detained for a traffic offense has a legal obligation to stop at the officer's direction and remain; the person may not unilaterally end the encounter and leave whenever he or she chooses").

Our conclusion that Smith did not "stop" defendant is reinforced by the location of the encounter. *Fair*, 353 Or at 600 ("The degree to which law enforcement conduct intrudes on a citizen's protected interest in privacy and liberty is significantly affected by where the conduct occurs, such as in the home, in an automobile, or on a public street."). Smith and defendant approached each other on a public road, where officers are generally "free to approach persons" to "seek their cooperation or assistance, request or impart information, or question them." *Backstrand*, 354 Or at 400 (internal quotation marks omitted). Their encounter did not take place in a home or other private place. *See Fair*, 353 Or at 600 (noting that "[a] government intrusion into the home is at the extreme end of the spectrum" as "[n]othing is as personal or private" and nothing "is more inviolate").

This case is thus distinguishable from *State v. K. A. M*, 361 Or 805, 401 P3d 774 (2017), where the Supreme Court concluded that "youth was stopped during the search of a drug house when a detective came upon youth and a friend in one of the bedrooms, told youth's friend to 'stay off the meth,' asked them their names, and then asked whether they had anything illegal on them." *Id.* at 807. The court noted that the detective's statement to youth's friend—"You need to stay off the meth"—"effectively accused her of being on or using methamphetamine," and observed that ordinarily "police officers do not walk into a person's bedroom uninvited or, if they do, not without some explanation as to why they are there." *Id.* at 811-12. It reasoned that the

detective's "unexplained entry into that private space"—*i.e.*, the bedroom—"and his accusation that [youth's friend] was using or had recently used methamphetamine created a coercive atmosphere that reasonably conveyed that she and youth were suspected of illegal drug use and were not free to leave until [the detective] had completed his inquiry." *Id.* at 811.

The court further explained that "[t]wo other circumstances support that understanding." *Id.* First, the detective "asked whether youth and [youth's friend] had anything illegal on them, a question that, given [the detective's] prior accusation of methamphetamine use, reasonably added to the coercive pressure." *Id.* Second, youth's friend "was aware (and so presumably was youth) that, although [the detective] was the only officer who had come into the bedroom, other officers were searching through the house." The court explained the "officers' unexplained presence in the house added to the coercive effect of [the detective's] presence in the bedroom." *Id.*

Here, the encounter between Smith and defendant took place on a public road, not in a bedroom. Although officers do not ordinarily enter bedrooms without explanation, it is not out of the ordinary for an officer to approach someone on a public road to make inquiries. Additionally, in this case, Smith was the only officer present, while in *K. A. M.*, the youth was presumably aware that other officers were in the house. *Id.* Further, in this case, Smith did not ask defendant whether he had anything illegal on him after defendant denied being high. And, finally, although Smith's inquiry of defendant—"Are you high?"—is somewhat similar to the accusation in *K. A. M.*—"You need to stay off the meth," *id.*—we do not believe that that inquiry, in conjunction with the other circumstances present in this case, transformed what was otherwise a mere encounter into a stop.

In sum, the totality of the circumstances in this case—including (1) the public nature of the encounter between defendant and Smith, (2) what a person would understand to be Smith's use of emergency lights for safety purposes, (3) that Smith parked 150 feet away from

defendant, (4) the fact that Smith's emergency lights, though visible to defendant, were not directed at defendant or used to pull defendant over, (5) that Smith's use of his emergency lights was the only practical way for Smith to have an exchange with defendant, and (6) that Smith inquired as to whether defendant was high and about the bulge in defendant's pocket, but did not directly accuse defendant of committing a crime or a traffic violation—did not create a whole greater than the sum of its parts such that a reasonable person in defendant's position would believe that Smith intentionally and significantly restricted, interfered with, or otherwise deprived defendant of his liberty or freedom of movement.[2]

## IV.   CONCLUSION

In light of our analysis above, considering the totality of the circumstances presented in this case, we conclude that defendant was not stopped by Smith. Consequently, we affirm.

Affirmed.

---

[2] Defendant filed memoranda of additional authority in which he contends that *Leiby* and *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), *overruled in part by State v. Unger*, 356 Or 59, 333 P3d 1009 (2014), support his position. We disagree.

In *Leiby*, we concluded that the defendant was "seized" when an officer engaged in what we characterized as a "dogged pursuit of defendant," and then, when the defendant finally stopped, the officer asked the defendant, "[i]s there any reason or do you want to tell me why you're trying to avoid me?" 293 Or App at 298. We noted that the "choice of the word 'avoid' would strongly imply to a reasonable person in defendant's situation that defendant had a duty or obligation to stop and interact with [the officer]," and that such "a phrase, when coupled with the obvious and open following of defendant can undermine a reasonable person's belief that they have an option other than remaining and answering the officer's questions." *Id.* In this case, Smith, unlike the officer in *Leiby*, did not engage in a "dogged pursuit" of defendant. Nor did Smith ask a question similar to that asked by the officer in *Leiby*. For that reason, *Leiby* does not help defendant.

In *Hall*, the Supreme Court concluded that an officer's encounter with the defendant constituted a stop where, among other facts, the defendant was aware that the officer was investigating whether the defendant was the subject of any outstanding warrants. 339 Or at 19. The court reasoned that it was "difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check." *Id.* In this case, Smith, unlike the officer in *Hall*, did not conduct a warrant check, nor is there evidence in the record indicating that a reasonable person in defendant's position would have thought Smith was doing so. For that reason, *Hall* does not help defendant.