No. 237 April 1, 2026 101

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STEFANI MICHELLE BROCK,
*Defendant-Appellant.*

Linn County Circuit Court
21CR01961; A180608

Brendan J. Kane, Judge.

Argued and submitted December 19, 2025.

Anna R. Johnson, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, Kamins, Judge, and Jacquot, Judge.

JACQUOT, J.

Reversed and remanded.

Tookey, P. J., dissenting.

**JACQUOT, J.**

Defendant entered a conditional no contest plea for felony identity theft and reserved her right to challenge the trial court's denial of her two motions to suppress. On appeal, she raises five assignments of error related to the court's denial of her two motions. The state responds that the trial court properly denied her motions to suppress. For the reasons provided below, we reverse.

Defendant was in a vehicle, which was parallel parked in a residential neighborhood. An officer observed that her brake lights were illuminated and that she was on her phone. He testified that his suspicion arose as he drove by; he made a U-turn and parked his patrol car behind her vehicle. He turned on rear-facing patrol lights mounted to the top of his patrol car, and blue flashing light was visible to defendant. He approached the driver's side window and informed her that she was being recorded and that she was not being stopped. He asked for her identification, which she handed to him. He wrote down the information and handed the card back to defendant. He asked defendant why she was in the area, and she responded that she was using Wi-Fi for her phone, which the officer believed to be "very odd because she was stationary in a residential area."

The officer returned to his vehicle, performed a search of her identification information and learned that there was an "unconfirmed warrant for her arrest * * *." The officer requested dispatch to confirm the warrant status, and the dispatcher communicated that she would determine whether it was to "cite and release or lodge her."[1] While the officer was awaiting confirmation of the warrant, he approached defendant's vehicle, asked her to step out, informed her of the warrant and detained her in handcuffs. The officer then learned that the warrant only authorized citation and release. Nevertheless, the officer continued to

---

[1] Although the record is not clear about who the dispatcher contacted, we assume it was an authority in Albany as the warrant originated from Albany. Ordinarily, "cite and release" refers to issuing a citation for the defendant to appear in court, *see* ORS 133.060, and releasing the defendant. On the other hand, to "lodge" a defendant means to take the individual to jail. *See Easton v. Hurita*, 290 Or 689, 702, 625 P2d 1290 (1981) (referring to "being lodged in jail").

detain defendant and asked for consent to search her person for officer safety reasons, which she provided.

He placed her in the back of his patrol car and then reapproached the vehicle and, using his flashlight, he thoroughly examined the interior of the car through the windows. The officer then returned to his patrol car to speak with defendant. Defendant explained that the vehicle was owned by a friend and that her own car was parked at a nearby grocery store. She declined the officer's request for consent to search the vehicle or any closed containers contained within. The officer testified that there were a high number of thefts and break-ins in the area and that defendant was displaying "extreme nervousness," which led him to believe her "story [was] not adding up" and that she was trying to conceal something like weapons or theft items. He believed that he had reasonable suspicion that "there was a potential crime involving [the] vehicle." The officer observed a glass pipe on the floor of the vehicle. The officer also communicated to defendant that he would be conducting a "wingspan search" of the inside of the vehicle, incident to her arrest. Once he observed the glass bong and a butane lighter—which he testified were both consistent with smoking methamphetamine—he believed he had probable cause that the car contained evidence of the crime of unlawful possession of methamphetamine.

After removing the pipe from the vehicle, the officer completed a thorough search of the entire vehicle, including the trunk and all bags and closed containers he found. During the search, he found "lock-picking tools," other drug paraphernalia, shaved keys, and weapons. The arresting officer, along with a backup officer who had arrived at the scene, bagged all the evidence and the two officers discussed possible charges. The arresting officer informed defendant that he would be driving her to her own car, which was at a different location. He said that he was going to look through the windows of her car and seize any evidence he saw inside.

Before going to the second location, the officer returned to the first vehicle and observed a magnetic lockbox on the outside of the vehicle, under the driver's seat. The officer believed that the magnetic box was included in

the wingspan search incident to arrest, because defendant could have reached it by opening the car door. The officer opened and searched the contents of the magnetic box.

The officer then took defendant to her vehicle and observed "556 ammo" in her car along with a magnetic box identical to the one recovered from the first vehicle. Defendant declined to consent to a search of that vehicle. The officer communicated he was going to seize her car as evidence and apply for a warrant to search it. The officer determined that she was not the registered owner of the vehicle but also that it had not been reported stolen. Defendant asked whether she would be able to retrieve her car after it was seized and searched. The officer said he was not sure if a car could be released to someone who is not listed as the registered owner. Defendant asked the officer whether, if she consented to search of the trunk, he would agree not to seize the car, and the officer agreed. She communicated that a friend of hers left an AR-15 in the trunk and then she consented to the search.

In her first assignment of error, defendant argues that the trial court erred when it determined that the officer's initial interactions with defendant did not constitute a stop. Defendant argued to the trial court that the officer conducted an unlawful seizure when he requested defendant's identification. Defendant argued that, given the totality of the circumstances, the officer did not have a reason to stop her and that his actions amounted to a stop because a reasonable person in her position would not believe she was free to leave once the officer parked his patrol vehicle—with lights flashing—behind the vehicle she was in and asked for her identification.

The trial court determined that the officer's initial interaction with defendant and request for her identification was not a stop because the officer activated his rear-facing lights, rather than "his overhead *** stopping lights," which was "not a sufficient show of authority" to render the action a stop.

We review a trial court's legal conclusions regarding a motion to suppress for legal error. *State v. Ehly*, 317 Or

66, 75, 854 P2d 421 (1993). We are bound by a trial court's factual findings so long as they are supported by constitutionally sufficient evidence. *State v. Arreola-Botello*, 365 Or 695, 697, 451 P3d 939 (2019).

The distinction between a seizure and "a constitutionally insignificant" encounter between police and an individual is the imposition of some restraint on the individual's liberty, either by physical force or a show of authority. *State v. Backstrand*, 354 Or 392, 399, 313 P3d 1084 (2013). "Whether a particular encounter constitutes a stop is fact-specific and requires an examination of the totality of the circumstances involved, and we consider all of an officer's actions as a whole greater than the sum of its parts." *State v. Kuehne*, 300 Or App 698, 702, 454 P3d 797 (2019), *rev den*, 366 Or 493 (2020) (internal quotation marks and citation omitted). For an encounter to be a stop, "[t]he officer must explicitly or implicitly convey to the person with whom [they are] dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about [their] ordinary affairs." *Id.* (internal quotation marks and citation omitted). That is, a person is stopped "if, by the content of the questions, the manner of asking them, or other actions that police take (along with the circumstances in which they take them) a reasonable person would understand that an officer is exercising their authority to detain." *Id.* (internal quotation marks and citation omitted). A request for identification, in and of itself, is not a seizure, nor is "an officer's act of checking the validity of that identification, in and of itself, a seizure." *Backstrand*, 354 Or at 417. Instead, "something more is required on an officer's part." *Id.*

When the officer initiated contact with defendant, he did "something more" than merely requesting her identification; he communicated a show of authority by activating blue flashing lights mounted on the top of his patrol car. He also took other actions that are commonly understood to be consistent with typical traffic stops. He initially drove past her vehicle, made a U-turn, parked his patrol car behind the car she was sitting in, approached her at the driver's-side window, asked about her reason for being in the area, and informed her that she was being recorded. *See,*

*e.g.*, *State v. Rodgers*, 347 Or 610, 613-15, 704-05, 227 P3d 695 (2010) (example of a common traffic stop, including officers approaching driver's- or passenger's-side windows); *see also State v. Robinson*, 310 Or App 644, 646, 486 P3d 28, *rev den*, 368 Or 638 (2021) (officer activated overhead lights to initiate a traffic stop).

During oral argument, the state agreed that "if the officer had turned on the overhead lights * * * at that point, the person is stopped." In officer-recorded footage of the interaction, blue flashing light emanating from lights atop the police vehicle is visible from defendant's location in the vehicle and reflects off of surrounding buildings. We conclude that a reasonable person in defendant's position would believe that the officer was conducting a traffic stop and that she was not free to unilaterally end the encounter. *See State v. Hall*, 238 Or App 75, 82, 241 P3d 757 (2010), *rev den*, 349 Or 664 (2011) (motorists are "not free [to] unilaterally * * * end" a traffic stop); *see also Arreola-Botello*, 365 Or at 702 (traffic stops involve an inherent show of authority).

The facts in this case are sufficiently distinguishable from those in *Kuehne*, 300 Or App at 704, a "close" case in which we determined that the initial interactions between the officer and the defendant did not constitute a stop. In *Kuehne*, we determined that a stop did not occur when an officer was dispatched because reports indicated that the "defendant was creating a traffic hazard by pushing a shopping cart in the travel lane" of a road that had no sidewalk and a narrow shoulder. *Id.* Relevant to that analysis, the officer in *Kuehne* parked his vehicle about 150 feet away from and facing the defendant; activated only his rear-facing lights (in other words, the lights were not directed towards defendant); the defendant and the officer walked towards each other; the officer recognized the defendant from prior "nonhostile" encounters, and the defendant had previously told that officer that he used methamphetamine. *Id.* at 704-05. Our determination that those facts did not constitute a stop relied, in part, on the fact that the officer and the defendant "approached each other on a public road." *Id.* at 707.

The context of the initial interaction between the officer and defendant was different in this case—they did

not approach each other on a public road. Instead, defendant was seated in a parked vehicle when the officer parked his patrol car behind her,[2] turned on his rear-facing blue lights, and approached her driver's side window—maneuvers similar to a common traffic stop.[3] Unlike in *Kuehne*, defendant was not the subject of any reported safety concern (or criminal report), and she was not doing anything observably unsafe.

Even though the officer said to defendant that she was not being stopped, given the totality of the circumstances, a person in her position would not reasonably believe she was free to leave. *See State v. Thompkin*, 341 Or 368, 378, 143 P3d 530 (2006) (when an individual knows they are being investigated by an officer, "we find it difficult to posit that a reasonable person would think" they were free to leave). We conclude that the officer's conduct and the context of the encounter amounted to a "stop" or seizure of defendant.

To be lawful, a stop must be supported by reasonable suspicion or probable cause. *Arreola-Botello*, 365 Or at 702, 709-10 (a stop not supported by reasonable suspicion or probable cause is unconstitutional); *see also* ORS 131.615 (an officer may effectuate a stop when they "reasonably suspect[]" that a crime has been committed or is about to be committed). Relying on its argument that the officer's initial interaction with defendant did not constitute a stop, the state argues that "it is immaterial whether" the officer had reasonable suspicion when he initiated contact with defendant.

___

[2] A traffic stop can be initiated while a vehicle is parked. *See, e.g.*, *Hall*, 238 Or App at 77-80 (traffic stop of a vehicle parked more than 12 inches from the curb).

[3] The dissent acknowledges that "a slight difference in circumstance could make what was considered a nonrestrictive encounter in one case a stop in another." 348 Or App 113 (Tookey, P. J., dissenting) (quoting *State v. Thier*, 322 Or App 680, 681, 521 P3d 175 (2022), *rev den*, 370 Or 827 (2023) (internal quotation marks omitted)). Because the officer in *Kuehne* parked his vehicle in front of and within the defendant's line of sight, the defendant, who was traveling on foot, could have turned and walked in the opposite direction to avoid police contact. In this case, even though the officer did not box defendant in, the officer was the one to approach defendant's vehicle. Given that dynamic within the totality of the circumstances, we are not persuaded that a reasonable individual would feel free to drive away. *See Hall*, 238 Or App at 82 (motorists are "not free [to] unilaterally *** end" a traffic stop).

Given that the state makes no argument that the stop was supported by reasonable suspicion or probable cause, we conclude that the stop was unconstitutional. "Generally, evidence will be suppressed if the evidence was the product of an unconstitutional act." *Arreola-Botello*, 365 Or at 714. The trial court erred by failing to grant defendant's motions to suppress all the evidence. Pursuant to ORS 135.335(3), "[a] defendant who finally prevails on appeal," after entering a conditional guilty plea, "may withdraw the plea." Thus, we need not conduct a harmlessness analysis in order to determine the appropriate remedy. *State v. Parnell*, 278 Or App 260, 270 n 4, 373 P3d 1252 (2016).

Because the trial court erred by denying defendant's motions to suppress, we reverse and remand. Given that disposition, we need not reach defendant's remaining assignments of error.

Reversed and remanded.

**TOOKEY, P. J.,** dissenting.

I disagree with the majority's conclusion that the trooper's initial interactions with defendant constituted a stop. "[T]o effect a stop, some exercise of coercive authority by the officer is required." *State v. Kuehne*, 300 Or App 698, 702, 454 P3d 797 (2019), *rev den*, 366 Or 493 (2020) (internal quotation marks omitted). "[A] show of authority does not exist simply because police officers convey their official status through uniforms, badges, or marked cars, or because an individual feels obliged to cooperate with the officer simply because of the officer's status." *Id.* at 703 (internal quotation marks omitted).

I briefly describe the relevant facts. At about 2:30 a.m., a trooper observed defendant's vehicle parked in a residential neighborhood with its brake lights and headlights on, and defendant, who was alone in the car, was on her phone. As he drove by, the trooper noticed that defendant turned off her headlights, which "raised [his] suspicion." At an intersection, the trooper turned around. The trooper parked his patrol car behind, but not directly behind, defendant's vehicle. A bodycam recording of the encounter shows that the location was very dark. The trooper activated his

side- and rear-facing overhead lights, which flashed blue light on surrounding structures and vehicles, but those blue lights were not directed towards defendant's vehicle. The trooper exited his patrol car and walked towards the parked vehicle.

When he got to the driver-side window, the trooper turned on a flashlight, said hello, identified himself, and told defendant that she was being recorded. When he began to ask whether everything was okay, defendant stated that she was trying to use her phone to call a friend. The trooper asked whether she lived in the area and defendant responded that she did and provided an address. The trooper told defendant that she was "not being stopped, or anything like that," and he asked, very politely, "Do you have an ID on you?" While she looked for her identification, the trooper repeated that defendant was being recorded.

Defendant handed over her driver's license, and the trooper said, "Perfect." While looking at the driver's license and writing down information in his notepad, the trooper asked whether defendant had driven into town for service. Defendant made a comment about phone service and Wi-Fi, and she also responded that her friend had called her and needed a pickup. The trooper handed defendant back her identification, saying, "I appreciate that, thank you," and then he walked back to his patrol car. The bodycam recording shows that the patrol car's overhead blue lights were flashing, but the blue lights were not shining forward; instead, they illuminated vehicles and structures to the side of and behind the patrol car.[1]

The trooper got back into his patrol car, and, using the information on his notepad, he learned from dispatch that defendant had a warrant and the dispatcher indicated that she would try to determine whether it was a "cite and release" warrant. The trooper got out of his patrol car, walked back to defendant, and let her know that she had a warrant for "theft 3" out of Albany Municipal Court. He asked defendant if she would mind stepping out of the vehicle. She

---

[1] The bodycam recording also shows that the trooper's headlights and a spotlight were on, but the parties made no arguments below or on appeal relating to that fact, so I do not consider it as part of my analysis.

asked whether it was a "cite and release" warrant. The officer stated, "That I don't know right now. It's showing that it's a custody warrant." He stated that he would try to make it "a cite and release," but, in the meantime, he asked defendant to step out of the vehicle. When defendant did so, he put her in handcuffs, he let her know that she was being detained, and he advised her of her *Miranda* rights.

Considering those facts, I agree with the parties that, when the trooper returned to the car and asked defendant to step out of the vehicle, she was seized. But that seizure was lawful because the trooper had learned that defendant had a warrant. According to the majority, the trooper seized defendant much earlier, and before he learned of the warrant. The majority determines that the trooper "communicated a show of authority by activating blue flashing lights mounted to the top of his patrol car." 348 Or App 106-07. I disagree with that analysis.

The recording of the encounter shows that the location was dark and that the blue flashing lights—although visible to defendant—were not directed toward defendant's vehicle. Instead, they were flashing to the side of and behind the patrol car. The trooper activated them for safety reasons when he stopped his patrol car on a dark street behind defendant's vehicle.[2] In *Kuehne*, 300 Or App at 704-06, we determined that use of rear-facing overhead lights to warn traffic did not constitute a show of authority sufficient to convert the encounter into a stop. Here, like in *Kuehne*, the trooper parked partially in the roadway, it was dark outside, and the emergency lights were not directed at defendant. In *Kuehne*, we recognized that there may be circumstances where the use of such lights is "the only practical way" for law enforcement to have an exchange with the defendant.

---

[2] At the hearing, the trooper testified that he activated his rear-facing lights to warn cars coming up behind them. In ruling on the motion to suppress, the trial court found that the trooper "hadn't activated his overhead lights as far as the stopping lights. He had activated his rear-facing lights specifically, as he articulated during his testimony, to show where his vehicle was. It was partially in the roadway and to warn drivers coming up behind that his vehicle was there." In reviewing the trial court's denial of the motion to suppress, "[w]e are bound by the trial court's express and implicit factual findings so long as they are supported by the record." *Kuehne*, 300 Or App at 699 (internal quotation marks omitted). Because the record supports the trial court's finding that the trooper activated the blue lights for safety reasons, I defer to that finding.

*Id.* at 704-05. Applying that precedent, the trooper's use of blue side- and rear-facing overhead lights for safety did not convert the encounter into a stop. *See also State v. Fair*, 353 Or 588, 598, 302 P3d 417 (2013) (observing that practical realities can inform what constitutes a "socially intrusive exercise of police authority").

Next, the majority determines that the trooper's encounter with defendant was a stop because he "took other actions that are consistent with or common during typical traffic stops," including making a U-turn, parking behind the parked vehicle, approaching defendant at her driver-side window, asking her why she was in the area, and informing her that she was being recorded. 348 Or App 106-07.

I am not persuaded that the trooper's actions were consistent with a traffic stop. The trooper did not say anything to suggest that defendant had committed a traffic violation. He did not pull defendant over.[3] He did not park his patrol car directly behind defendant's vehicle; instead, he parked about two or three car lengths away, and he did not block her or box her in.[4] And after he parked, the trooper walked over to defendant's vehicle to ascertain why she was there, but law enforcement may "approach and question persons sitting in parked vehicles without triggering constitutional protections against unreasonable seizures." *State v. Anderson*, 354 Or 440, 454, 313 P3d 1113 (2013) (concluding that no stop occurred when three officers approached the defendant and his companion in a parked car); *see also State v. Dierks*, 264 Or App 443, 445, 452, 332 P3d 348 (2014) (no stop where a police officer in a patrol car saw a parked car, pulled over, and questioned the occupants).

Throughout his initial encounter with defendant, the trooper was very polite as he sought to determine why she was parked at that location in the middle of the night. Like in *Anderson*, 354 Or at 453, the trooper's tone and

---

[3] The majority points out that a traffic stop can be initiated while a vehicle is parked. 348 Or App 108, n2. But the parties do not argue that this was a traffic stop. Instead, the issue is whether the initial encounter rose to the level of a stop.

[4] The trooper testified that he did not park right on defendant's bumper, that he had to walk to get to her car, and that he did not block her car. The bodycam recording shows the patrol car was about two or three car lengths behind defendant's vehicle.

manner were not overbearing or controlling, and the verbal exchange was brief. The trooper told defendant twice that she was being recorded, but that statement did not make the encounter more coercive. And even if being told she was being recorded made defendant uncomfortable, "[t]he fact that the citizen is discomforted by an officer's approach *** does not make the contact a seizure." *State v. Backstrand*, 354 Or 392, 400, 313 P3d 1084 (2013).

The trooper asked defendant for her identification, but asking for identification "is not sufficient, in and of itself, to result in a seizure." *Id.* at 409-10. Retaining a defendant's identification for a short period of time to check its validity does not turn an encounter into a stop. *Id.* at 417. Notably, here, the trooper did not retain defendant's driver's license; instead, he wrote down its information and returned it to defendant before walking back to his patrol car. And he expressly told defendant that she was not being stopped. *See State v. True*, 324 Or App 621, 628, 527 P3d 42, *rev den*, 371 Or 477 (2023) (no stop where, among other facts, the officer told the defendant that the contact was not a stop). Those circumstances do not add up to a stop.

Determinations of whether a person is seized under Article I, section 9, of the Oregon Constitution are "factually driven," and "a slight difference in circumstances could make what was considered a nonrestrictive encounter in one case a stop in another." *State v. Thier*, 322 Or App 680, 681, 521 P3d 175 (2022), *rev den*, 370 Or 827 (2023) (internal quotation marks omitted). Although close cases frequently arise, "the constitutional concern is with police-imposed restraints on citizen liberty, not with limiting contacts between police and citizens." *Backstrand*, 354 Or at 400. The key question is whether there was a "show of authority" that "reasonably conveys to the person a significant restriction on the person's freedom to terminate the encounter or otherwise go about his or her ordinary affairs." *Anderson*, 354 Or at 450.

Here, the trooper: (1) pulled up behind, but not directly behind, defendant's parked vehicle; (2) activated his side- and rear-facing blue lights for safety reasons; (3) walked up to defendant's vehicle; (4) politely sought to ascertain why defendant was there; (5) told defendant that

she was being recorded and that she was not being stopped; (6) asked defendant for identification, wrote down the information, and returned her driver's license; (7) and walked back to his patrol car to check defendant's information. If those facts, considered together, add up to a stop, then I am hard pressed to imagine how a police officer in a patrol car could ever safely approach someone in a parked car on a public street at nighttime without reasonable suspicion of a crime.

In my view, the facts here are less coercive than those in *Anderson*, 354 Or 442-45, in which the Supreme Court concluded that there was no stop. In that case, three officers approached the two occupants of a parked car, and they asked questions and provided information that "objectively conveyed possible suspicion that the driver and defendant could be involved in criminal activity * * *, but they equally conveyed that the officers were interested in whatever information the two might be able to provide." *Id.* at 453. In contrast, here, one trooper approached defendant, not three, and during the trooper's initial interaction with defendant, he did not say anything that would convey an impression that he suspected defendant of involvement with criminal activity. Instead, he was trying to figure out why defendant was parked at that location in the middle of the night. Considering the circumstances as a whole, including the use of blue side- and rear-facing overhead lights for safety, the trooper "did not communicate an exercise of authority of the kind required for a seizure—*i.e.*, authority to restrain." *Id.* I would therefore affirm on the first assignment of error.

I decline to address defendant's remaining assignment of error. When the case returns to the trial court, then defendant will have to decide whether to withdraw her plea of no contest to one count of identity theft, ORS 135.335(3), and, if so, the case will proceed on the basis that "all the evidence" must be suppressed. 348 Or App 109. Alternatively, if the state petitions for review, and if the Supreme Court allows review and agrees that defendant was not stopped during her initial interactions with the trooper, then it will likely remand the case to us to address defendant's

remaining assignments of error, some of which implicate questions currently pending before the Supreme Court. *See State v. Barajas*, 332 Or App 252 (nonprecedential opinion), *rev allowed*, 372 Or 763 (2024) (allowing review to address the search incident to arrest exception to the warrant requirement). Therefore, at this juncture, I see no utility in addressing defendant's remaining assignments of error.

I respectfully dissent.